UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ROBERT HUNTER; ELMER IRWIN; DOUG
MERRIN; and THE SECOND AMENDMENT
FOUNDATION,

                    Plaintiffs,               5:23-CV-1540
                                             (GTS/ML)
v.

CORTLAND HOUSING AUTHORITY; and
ELLA M. DIIORIO,[1] in her official capacity as
Executive Director of Cortland Housing Authority,

                    Defendants.

_____

APPEARANCES:                         OF COUNSEL:

BOUCHNER PLLC                     EDWARD A. PALTZIK, ESQ.
  Counsel for Plaintiffs              SERGE KRIMNUS, ESQ.
1040 Avenue of the Americas, 15th Floor
New York, NY 10018

LIGUORI & HOUSTON, PLLC         JOHN W. LIGUORI, ESQ.
  Counsel for Defendants          MARK T. HOUSTON, ESQ.
Liguori & Houston, PLLC
69 State Street, Suite 1200
Albany, NY 12207

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

       Currently before the Court, in this civil rights action filed by Robert Hunter, Elmer Irwin,

Doug Merrin, and The Second Amendment Foundation ("Plaintiffs") against Cortland Housing

Authority and Ella M. Diiorio, in her official capacity as Executive Director thereof

---

      [1]     In her Declaration, the individual Defendant corrected the spelling of her last
name as "Diiorio," not "DiLorio." (Dkt. No. 17, Attach. 1, at 1.) As a result, the Clerk of Court
is directed to amend the docket sheet accordingly.

("Defendants"), are Plaintiffs' consolidated motion for a temporary restraining order and motion for a preliminary injunction pursuant to Fed. R. Civ. P. 65, enjoining Defendants, their officers, agents, servants, employees and attorneys and those acting in concert with them, from taking any action to enforce, or otherwise requiring any person or entity to comply with, the Firearms Ban as set forth in "Tenant's Obligations" in Article IX, Section (p) of Defendants' standard Residential Lease Agreement, pending final resolution of this action.  (Dkt. Nos. 2, 11.)  Defendants have responded; Plaintiffs have replied; and oral argument has been held.  (Dkt. Nos. 17, 19; Text Minute Entry for Jan. 16, 2024.)  For the reasons set forth below, Plaintiffs' consolidated motion is granted.

## I.    RELEVANT BACKGROUND

### A.    Plaintiffs' Original Complaint

Generally, liberally construed, Plaintiffs' original Complaint alleged that Cortland Housing Authority ("CHA"), a New York State public housing authority that receives federal funding and houses tenants, categorically bans CHA tenants (including the three individual Plaintiffs, who live in the Galatia Apartments) from possessing firearms and other weapons on CHA premises, by requiring them, as a condition of receiving the benefit of CHA public housing, to enter into a standard Residential Lease Agreement ("RLA"), which provides (in the "Tenant's Obligations" in Article IX, Section [p] of the RLA) that the "Tenant shall be obligated: . . . Not to display, use, or possess or allow members of Tenant's household or guest to display, use or possess any firearms (operable or inoperable) or other weapons as defined by the laws and courts of the State of New York anywhere on the property of CHA" ("Firearms Ban").  (Dkt. No. 1, at ¶¶ 1-31.)

2

Generally, based on these factual allegations, Plaintiffs' Complaint asserted two claims against Defendants: (1) a claim, by all Plaintiffs against all Defendants, that Defendants' Firearms Ban, facially and as applied to Plaintiffs, violates their right to keep and bear arms in their homes under the Second Amendment, as incorporated against the states through the Due Process Clause of the Fourteenth Amendment; and (2) a claim, by the individual Plaintiffs against all Defendants, that Defendants' Firearms Ban, facially and as applied to Plaintiffs, violates their right not be impermissibly discriminated against based on their status as elderly, disabled, and financially-disadvantaged individuals who make their homes in public housing facilities, under the Equal Protection Clause of the Fourteenth Amendment.  (*Id*. at ¶¶ 32-54.)

Generally, as relief for these claims, the original Complaint sought injunctive relief, declaratory relief, damages, and attorneys' fees.  (*Id*. at ¶ 55.)

**B.      Plaintiffs' Amended Complaint**

Generally, liberally construed, Plaintiffs' Amended Complaint alleges facts similar to those alleged in their original Complaint.  (*Compare* Dkt. No. 1, at ¶¶ 1-31 *with* Dkt. No. 20, at ¶¶ 1-55.)  In addition, Plaintiffs' Amended Complaint (1) elaborates on the two public benefits received by CHA tenants from Defendants and the reservation by those tenants of their constitutional rights upon receiving those benefits, (2) elaborates on the approval by two other federal courts of stipulated settlement of similar firearms bans, and (3) asserts new factual allegations regarding Defendants censorship of Plaintiff Hunter's First Amendment speech on the CHA Facebook page.  (*Id*.)

Generally, based on these factual allegations, Plaintiffs' Amended Complaint asserts four claims against Defendants: (1) a claim, by all Plaintiffs against all Defendants, that Defendants'

Firearms Ban, facially and as applied to Plaintiffs, violates their right to keep and bear arms in their homes under the Second Amendment, as incorporated against the states through the Due Process Clause of the Fourteenth Amendment; (2) a claim by Plaintiff Hunter against all Defendants, that Defendants' censorship of his protected speech on the CHA Facebook page violates his right of free speech under the First Amendment, as incorporated through the Fourteenth Amendment; (3) a claim by Plaintiff Hunter against all Defendants, that Defendants' deletion of his disagreement with the Firearms Ban on the CHA Facebook page violates his right to petition the government for the redress of grievances under the First Amendment, as incorporated through the Fourteenth Amendment; and (4) a claim, by the individual Plaintiffs against all Defendants, that Defendants' Firearms Ban, facially and as applied to Plaintiffs, violates their right not be impermissibly discriminated against based on their status as elderly, disabled, and financially-disadvantaged individuals who make their homes in public housing facilities, under the Equal Protection Clause of the Fourteenth Amendment. (*Id*. at ¶¶ 32-54.)

Generally, as relief for these claims, the Amended Complaint sought injunctive relief, declaratory relief, damages, and attorneys' fees. (*Id*. at ¶ 101.)

### C.   Parties' Briefing on Plaintiffs' Consolidated Motion

#### 1.   Plaintiffs' Memorandum of Law

Generally, in support of their consolidated motion, Plaintiffs assert three arguments. (*See generally* Dkt. No. 2, Attach. 1 [Plfs.' Memo. of Law].)

First, Plaintiffs argue, they are highly likely to prevail on the merits of their first claim[2]

---

[2]      Although Plaintiffs filed their Amended Complaint after filing this consolidated motion, the first claim of their Amended Complaint remained the same as the first claim of their original Complaint. *See, supra,* Parts I.A. and I.B. of this Decision and Order.

(the only claim on which they need to do so) for each of four independent reasons: (a) pursuant to the standard set forth in *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008), Defendants must show that the Firearms Ban (which is a wholesale ban on the possession of firearms) is part of a historical tradition of firearms regulation, but it is beyond cavil that there is no historical tradition of banning firearms possession in American homes (where the need for defense of self, family, and property is most acute); (b) indeed, because the individual Plaintiffs are of extremely limited economic means and have no other homes or residences at which to maintain or store firearms, the Firearms Ban unconstitutionally prohibits them from even *owning* firearms; (c) moreover, because the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, Defendants' Firearms Ban is unconstitutional also by banning the at-home possession of other legal non-firearm weapons, such as knives; and (d) the high likelihood of Plaintiffs' success on the merits of their first claim is confirmed by the fact that, in the case of *Doe v. East St. Louis Housing Authority*, 18-CV-0545, Order of Final Judgment and Permanent Injunction (S.D. Ill. filed Apr. 11, 2019), a challenge of a similar ban by the East St. Louis Housing Authority resulted in an injunction permanently enjoining enforcement of the offending lease provisions.  (*Id*. at 9-12 [attaching pages "5" through "8"].)

Second, Plaintiffs argue, they will suffer irreparable harm absent injunctive relief for each of two independent reasons: (a) it is well settled that the existence of a constitutional violation constitutes irreparable harm, without any further evidentiary showing; and (b) in any event, the continuation of the irreparable harm is inevitable absent Court intervention, as evidenced by Defendants' appalling and explicitly-stated open disregard for the law in defense counsel's email of May 1, 2023, to Plaintiff Hunter (acknowledging the "[u]nconstitutional lease provision

regarding firearms," but stating that "[w]e will not be changing our stated position or lease provision on this matter"). (*Id*. at 13-15 [attaching pages "9" through "11"].)

Third, Plaintiffs argue, the balance of equities and public interest both overwhelmingly favor granting injunctive relief for two reasons: (a) the equities weigh strongly in favor of granting injunctive relief, because doing so would cause no harm to Defendants and would simply compel them to conform their rules to the United States Constitution, while denying injunctive relief would cause Plaintiffs to continue to suffer daily violation of their fundamental Second Amendment rights; and (b) the public interest would also be served by granting injunctive relief, because doing so would uphold the Constitution and comply with the Supreme Court's Second Amendment jurisprudence, while denying injunctive relief would cause severe harm to the public interest, given that public authorities that flout the Constitution cause harm to the public. (*Id*. at 15 [attaching page "11"].)

### 2.    **Defendants' Opposition Memorandum of Law**

Generally, in response to Plaintiffs' motion, Defendants assert five arguments. (*See generally* Dkt. No. 17, Attach. 8 [Defs.' Opp'n Memo. of Law].)

First, Defendants argue, the claims of Plaintiff Second Amendment Foundation should be dismissed for lack of standing. (*Id*. at 14-15 [attaching pages "7" and "8"].)[3]

---

[3]    The Court will neither elaborate on, nor evaluate, this argument in this Decision and Order, because (1) only the first claim of Plaintiffs' Amended Complaint has been placed at issue by Plaintiffs' consolidated motion, and (2) only "one plaintiff [need] have standing to seek each form of relief requested in [a] complaint." *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008). Here, each of the forms of relief requested with regard to the first claim of Plaintiffs' Amended Complaint has been sought by all three individual Plaintiffs; and Defendants have not challenged the standing of any of those three individual Plaintiffs. (*Compare* Dkt. No. 20, at ¶¶ 56-77, 101[a], 101[b], 101[g], 101[h] *with* Dkt. Nos. 17 *and* 24.) As a result, the Court will decide the issue of the standing of Plaintiff Second

Second, Defendants argue, as a threshold matter, Plaintiffs have failed to demonstrate a clear or substantial likelihood of success on the merits of their Complaint (as they must, under the circumstances), because (a) Plaintiffs' entire argument is premised upon the result of *N. Doe v. East St. Louis Housing Authority*, 18-CV-0545 (S.D. Ill), and their characterization of the firearms restriction as a "categorical ban" on firearms, (b) the case of *N. Doe v. East St. Louis Housing Authority* is distinguishable in that there was no determination of fact or law made by the district court regarding the constitutionality of the firearm ban, the firearms ban did not define the term "firearms" as CHA's restriction does in this case, and the stipulation in question recognized that the East St. Louis Housing Authority did have authority to regulate firearms on its properties, and (c) there is no "categorical ban" on the possession of firearms on CHA property, given that tenants may possess rifles and shotguns on CHA property (as well as other traditional hunting weapons such as crossbows) without incurring a breach of the lease.  (*Id.* at 15-21 [attaching pages "8" through "14"].)

Third, Defendants argue, three additional reasons exist that Plaintiffs have failed to demonstrate a clear or substantial likelihood of success on the merits of their Complaint: (a) the firearms restriction is consistent with the Nation's historical tradition of firearm regulation, because public housing authorities were "unimaginable at the founding" of our Nation (requiring the Court to utilize a "more nuanced approach" to its historical analysis), and here – reasoning by analogy – public housing authorities may limit certain firearms on their properties despite the fact that the guarantees of the Second Amendment are at their zenith within the home, just as public housing authorities may limit who may be part of a tenant's household despite the deeply rooted

---

Amendment Foundation in a subsequent Decision and Order.

fundamental right of a family to live together as a family; (b) the challenged firearms restriction is not an "unreasonable term[] [or] condition[]" under 42 U.S.C. § 1437d(1)(2), because it is rationally related to a legitimate housing purpose (specifically, preventing gun violence and involuntary gun injuries on CHA's property); (c) CHA is not requiring Plaintiffs to give up a constitutional right for their housing subsidy, because an individual does not have a fundamental right to public housing, Plaintiffs are free to convert their subsidies to a Housing Choice Voucher (formerly known as "Section 8") and seek private housing if they desire to exercise their Second Amendment rights to their fullest, and the restriction is not actually a ban but a choice by CHA "simply not to subsidize the right of tenants to possess certain firearms on its properties."  (*Id*. at 22-29 [attaching pages "15" through "22"].)

Fourth, Defendants argue, Plaintiffs have not demonstrated a strong showing of any irreparable harm by CHA's firearms restriction, because (a) it is appropriate to determine irreparable injury under the circumstances by considering what adverse factual consequences Plaintiffs apprehend if an injunction is not issued, and then whether the infliction of those consequences is likely to violate any of Plaintiffs' rights, (b) here, although Plaintiffs allege a violation of their Second Amendment Rights, they have not demonstrated any adverse factual consequence except for their inability to possess a firearm on CHA property (which is entirely conclusory and does not fully demonstrate their ability to actually purchase and possess a firearm under New York law), and (c) in fact, all three individual Plaintiffs have lived on CHA property for an extensive period of time without possessing a firearm (or complaining about the restriction), thus undermining their argument that they will suffer irreparable harm.  (*Id*. at 29-31 [attaching pages "22" through "24"].)

8

Fifth, Defendants argue, the equities do not favor Plaintiffs, and a preliminary injunction is not in the best interest of the public, because (a) although the equities favor compliance with the Constitution and Federal law, equally compelling is the public interest in maintaining the safety of CHA's tenants by restricting firearms on its properties while this matter is litigating on the merits, (b) the relief requested by Plaintiffs (a complete injunction restricting Defendants from enforcing any firearms regulation on its properties) would pose a risk to public safety by allowing members of the general public to bring weapons onto CHA property, and (c) there are more tenants who prefer the restrictions to remain in place until at least the conclusion of this litigation.  (*Id.* at 31-32 [attaching pages "24" and "25"].)

### 3.      Plaintiffs' Reply Memorandum of Law

Generally in their reply, Plaintiffs assert five arguments.  (*See generally* Dkt. No. 19 [Plfs.' Reply Memo. of Law].)

First, Plaintiffs argue, the Firearms Ban violates the Unconstitutional Conditions Doctrine ("UCD") for three reasons: (a) the UCD applies when the government offers a public benefit "even if the government has no obligation to offer the benefit," and here the individual Plaintiffs (and other CHA tenants) receive public benefits from Defendants in the form of both a subsidy to the individual tenant (partially covering the cost of CHA public housing) and residency in CHA public housing to the tenant; (b) under the UCD, the existence of alternative benefit options is no defense to an unconstitutional lease provision for the same reasons that the lack of a fundamental right to the benefit in question is no such defense; and (c) Defendants' choice-not-to-subsidize argument is illogical because the act "not subsidize[d]" is a constitutional right (just like the First Amendment right to freely express one's political and religious viewpoints, or the Fourth

Amendment right to be free from unreasonable searches and seizures).  (*Id*. at 5-7 [attaching pages "2" through "4"].)

Second, Plaintiffs argue, Defendants' analysis of *Bruen* is meritless, because (a) *Bruen* demands that "the government must affirmatively prove that its *firearms regulation* is part of the historical tradition that delimits the outer bounds of the right to keep and bear *arms*" (emphasis added to citation), and (b) here, Defendants improperly attempt to analogize a challenged firearms regulation to a *non-firearms* regulation.  (*Id*. at 4-9 [attaching pages "4" through "6"].)

Third, Plaintiffs argue, the definition of "firearms" in the RLA includes handguns and violates *Heller* for two reasons: (a) as a threshold matter, there are multiple broader definitions of "firearms" under New York law (including under the N.Y. Penal Law), and here the term "firearms" must be given its broadest interpretation, given that ambiguities must be construed against the drafter of the document in question (i.e., CHA) under New York law; and (b) in any event, even if Defendants were correct that the Firearms Ban applies only to handguns (and not to rifles and shotguns), the Supreme Court rejected this argument in *Heller* when it explained, "It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed."  (*Id*. at 9-12 [attaching pages "6" through "9"].)

Fourth, Plaintiffs argue, Defendants' argument that the individual Plaintiffs never before objected to the Firearms Ban (or informed CHA that they owned or possessed firearms) is without merit, because (a) it is an attempt to shift the burden to Plaintiffs, and (b) *Bruen* places the burden on Defendants under the circumstances to "affirmatively prove that its firearms regulation is part of the [relevant] historical tradition."  (*Id*. at 12-13 [attaching pages "9" and

"10"].)

Fifth, Plaintiffs argue, also without merit are Defendants' arguments that (a) Plaintiff Hunter is objecting to the Firearms Ban merely in retaliation against the CHA for a failed eviction proceedings brought by CHA against him, (b) Plaintiff Hunter is a racist, (c) the Firearms Ban is justified based on "public safety" grounds (given the fact that some units are occupied by individuals with "known criminal histories"), and (d) the Firearms Ban has never previously been the subject of complaints by anyone. (*Id*. at 13 [attaching page "10""].)

## II.    GOVERNING LEGAL STANDARD

"In the Second Circuit, the standard for issuance of a temporary restraining order is the same as the standard for a preliminary injunction." *Antonyuk v. Hochul*, 635 F. Supp.3d 111, 124-25 (N.D.N.Y. 2022) (Suddaby, J.) (citing cases).

Generally, in the Second Circuit, a party seeking a preliminary injunction must establish the following three elements: (1) that there is either (a) a likelihood of success on the merits and a balance of equities tipping in the party's favor or (b) a sufficiently serious question as to the merits of the case to make it a fair ground for litigation and a balance of hardships tipping decidedly in the party's favor; (2) that the party will likely experience irreparable harm if the preliminary injunction is not issued; and (3) that the public interest would not be disserved by the relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (reciting standard limited to first part of second above-stated element and using word "equities" without the word "decidedly"); *accord, Glossip v. Gross*, 135 S. Ct. 2726, 2736-37 (2015); *see also Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015) (reciting standard including second part of second above-stated element and using words "hardships" and "decidedly"); *Citigroup*

11

*Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010) (holding that "our venerable standard for assessing a movant's probability of success on the merits remains valid [after the Supreme Court's decision in *Winter*]").

With regard to the first part of the first element, a "likelihood of success" requires a demonstration of a "better than fifty percent" probability of success. *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), *disapproved on other grounds, O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, n.2 (1987). "A balance of equities tipping in favor of the party requesting a preliminary injunction" means a balance of the hardships against the benefits. *See, e.g., Ligon v. City of New York,* 925 F. Supp.2d 478, 539 (S.D.N.Y. 2013) (characterizing the balancing "hardship imposed on one party" and "benefit to the other" as a "balanc[ing] [of] the equities"); *Jones v. Nat'l Conference of Bar Examiners,* 801 F. Supp. 2d 270, 291 (D. Vt. 2011) (considering the harm to plaintiff and any "countervailing benefit" to plaintiff in balancing the equities); *Smithkline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc.,* 99-CV-9214, 1999 WL 34981557, at *4-5 (S.D.N.Y. Sept. 13, 1999) (considering the harm to defendant and the "benefit" to consumers in balancing the equities); *Arthur v. Assoc. Musicians of Greater New York*, 278 F. Supp. 400, 404 (S.D.N.Y. 1968) (characterizing "balancing the equities" as "requiring plaintiffs to show that the benefit to them if an injunction issues will outweigh the harm to other parties"); *Rosenstiel v. Rosenstiel*, 278 F. Supp. 794, 801-02 (S.D.N.Y.1967) (explaining that, in order to "balance the equities," the court "will consider the hardship to the plaintiff . . . , the benefit to [the] plaintiff . . . , and the relative hardship to which a defendant will

be subjected") [internal quotation marks omitted].[4]

With regard to the second part of the first element, "[a] sufficiently serious question as to the merits of the case to make it a fair ground for litigation" means a question that is so "substantial, difficult and doubtful" as to require "a more deliberate investigation." *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953); *accord, Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205-06 (2d Cir. 1970).[5]  "A balance of hardships tipping decidedly toward the party requesting a preliminary injunction" means that, as compared to the hardship suffered by other party if the preliminary injunction is granted, the hardship suffered by the moving party if the preliminary injunction is denied will be so much greater that it may be characterized as a "real hardship," such as being "driven out of business . . . before a trial could be held." *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 58 (2d Cir. 1979); *Int'l Bus. Mach. v. Johnson*, 629 F. Supp.2d 321, 333-34 (S.D.N.Y. 2009); *see also Semmes Motors, Inc.,* 429 F.2d at 1205 (concluding that the balance of hardships tipped decidedly in favor of the movant where it had demonstrated that, without an injunctive order, it would have been forced out of business as a Ford distributor).[6]

---

[4]     *See also Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12, n.2 (7th Cir. 1992) ("Weighing the equities as a whole favors X, making preliminary relief appropriate, even though the *undiscounted* balance of harms favors Y.") [emphasis added].

[5]     *See also Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997); *Rep. of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988);  *City of Chanute v. Kansas Gas and Elec. Co.,* 754 F.2d 310, 314 (10th Cir. 1985); *R.R. Yardmasters of Am. v. Penn. R.R. Co.*, 224 F.2d 226, 229 (3d Cir. 1955).

[6]     The Court notes that, under the Second Circuit's formulation of this standard, the requirement of a balance of *hardships* tipping *decidedly* in the movant's favor is added only to the second part of the first element (i.e., the existence of a sufficiently serious question as to the merits of the case to make it a fair ground for litigation), and not also to the first part of the first

With regard to the second element, "irreparable harm" is "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113 (2d Cir. 2003). Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

With regard to the third element, the "public interest" is defined as "[t]he general welfare of the public that warrants recognition and protection," and/or "[s]omething in which the public as a whole has a stake[,] esp[ecially], an interest that justifies governmental regulation." *Black's Law Dictionary* at 1350 (9th ed. 2009).

The Second Circuit recognizes three limited exceptions to the above-stated general standard. *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4.

First, where the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous "serious questions" standard but should grant the injunction only if the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim. *Id.* (citing *Able v. United States*, 44 F.3d 128, 131 [2d Cir. 1995]); *see also Otoe-Missouria Tribe of*

---

element (i.e., the existence of a likelihood of success on the merits), which (again) requires merely a balance of *equities* (i.e., hardships and benefits) tipping in the movant's favor. *See Citigroup Global Markets, Inc.*, 598 F.3d at 36 ("Because the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips decidedly' in its favor . . . , its overall burden is no lighter than the one it bears under the 'likelihood of success' standard.") (internal citation omitted); *cf. Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp.2d 186, 192 (E.D.N.Y. 2013) ("[T]he *Winter* standard . . . requires the balance of equities to tip in the movant's favor, though not necessarily 'decidedly' so, even where the movant is found likely to succeed on the merits.").

*Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) ("A plaintiff cannot rely on the 'fair-ground-for-litigation' alternative to challenge governmental action taken in the public interest pursuant to a statutory or regulatory scheme.") (internal quotation marks omitted). This is because "governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Able,* 44 F.3d at 131.

Second, a heightened standard–requiring both a "clear or substantial" likelihood of success and a "strong" showing of irreparable harm"–is required when the requested injunction (1) would provide the movant with all the relief that is sought and (2) could not be undone by a judgment favorable to non-movant on the merits at trial. *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4 (citing *Mastrovincenzo v. City of New York*, 435 F.3d 78, 90 [2d Cir. 2006]); *New York v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) ("When either condition is met, the movant must show [both] a 'clear' or 'substantial' likelihood of success on the merits . . . *and* make a 'strong showing" of irreparable harm' . . . .") (emphasis added).

Third, the above-described heightened standard may also be required when the preliminary injunction is "mandatory" in that it would "alter the status quo by commanding some positive act," as opposed to being "prohibitory" by seeking only to maintain the *status quo*. *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4 (citing *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 34 [2d Cir. 1995]).[7]  As for the point in time that serves as the *status quo*, the

---

[7]     Alternatively, in such a circumstance, the "clear or substantial likelihood of success" requirement may be dispensed with if the movant shows that "extreme or very serious damage will result from a denial of preliminary relief." *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4 (citing *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 34 [2d Cir. 1995]).

Second Circuit has defined this point in time as "the last actual, peaceable uncontested status which preceded the pending controversy." *LaRouche v. Kezer*, 20 F.3d 68, 74, n.7 (2d Cir. 1994); *accord, Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014); *Actavis PLC*, 787 F.3d at 650.

## III.   ANALYSIS

### A.   Substantial Likelihood of Success on the Merits

After carefully considering the matter, the Court finds that Plaintiffs have demonstrated a substantial likelihood on the merits of their first claim, for the reasons stated by them in their memoranda of law. *See, supra,* Parts I.C.1. and I.C.3. of this Decision and Order. To those reasons, the Court adds four points (which are intended to supplement, and not supplant, Plaintiffs' reasons).

First, as a threshold matter, the Court has trouble accepting defense counsel's argument that "[p]ublic housing . . . was assuredly not something that our Founding Fathers could have contemplated at the time of the drafting of the Constitution or the time of the drafting of the Second Amendment, [because] it just did not exist. Publicly-funded housing for low-income families was not . . . on their radar . . . . [A]s Justice Thomas said, it's a new circumstance in our modern society." (Dkt. No. 27, at 15 [Hrg. Tr.].) To the contrary, in numerous states, past generations appear to have provided publicly funded housing for low-income families and individuals – albeit likely for less-definite terms of duration than in modern public housing – in the form of places such as publicly supported "almshouses," poor-houses, and poor-farms. *See, e.g.,* Blacks Law Dictionary 90 (9th ed. 2009) (defining "almshouse" as an "[a]rchaic" term for "[a] dwelling for the *publicly* or privately supported poor of a city or county") (emphasis added);

16

Frank B. Sanborn, *The Management Of Almshouses In New England*, at 1 (Press of Geo. E. Ellis, 1884) (stating that "[t]he poorhouses of New England [have] generally [been] called almshouses . . . since their first establishment, more than two centuries ago," even though some of those almshouses were no longer "parish establishments"); Robert H. Bremner, *The Discovery of Poverty in the United States* at 47-48 (Transaction Pub. 1992) (stating that, in 1883, "[t]here were tax-supported almhouses" to which entire "famil[ies]" were "commit[ed]").  Even if such historical analogues could be fairly characterized as "historical twin[s]" or "dead ringers," other relevant similarities would appear to exist to any historical regulation of firearms in boarding houses or the residences of indentured servants.

Granted, the Court does not demand that Defendants show that firearms were traditionally banned in these analogous places.  The Court is dutifully mindful of the Second Circuit's criticism of reasoning from "historical silence."  *Antonyuk v. Chiumento*, 89 F.4th 271, 301, 321 (2d Cir. 2023).  For example, lawmakers may not have been moved to forbid the possession of firearms by people who could not afford to own them, or the possession of firearms at locations where the firearms owner resided at the whim of a cautious or peace-keeping property owner.  However, one would imagine that a thorough analysis of the Firearms Ban in question would at least start with an acknowledgment that any historical regulations of firearms in the above-referenced almshouses, poor-houses, and poor-farms would be relevantly similar to the Firearms Ban: after all, both the historical and modern regulations would impose a comparable burden (i.e., denying one the ability to defend oneself in one's – potentially congested – publicly funded residence through the use of a firearm), and both the historical and modern regulations would carry a comparable justification (i.e., preventing the unwarranted danger to others in close

proximity to oneself due to the non-defensive use of a firearm).  However, Defendants do not acknowledge the existence of those relevant similarities, much less try to posit the reason for the apparent dearth of such historical analogues.[8]  Instead, Defendants argue that both the fact of public housing and the rate of gun violence therein are wholly unprecedented, necessitating the "more nuanced approach" permitted by the Second Circuit in *Antonyuk* and the Supreme Court in *Bruen*; and then Defendants leap to a comparison of the modern firearms regulation to a *non-firearms* regulation (specifically, the regulation of the fundamental right of a family to live as a family).

Even if the Court were to agree that a "more nuanced approach" is appropriate here,[9] the Court has trouble accepting Defendants' argument such an approach constitutes a license for them to analogize the Firearms Ban to a *non-firearm* regulation, under the circumstances.  In addition to the fact that four closer analogies appear to exist (again, the regulation, or lack of regulation, of firearms in almshouses, poor-houses, poor-farms, boarding houses, and indentured-servant residences), neither the Second Circuit in *Antonyuk* nor the Supreme Court in *Bruen*

---

[8]     Defendants did not discuss any such historical analogies in their opposition papers or during oral argument.  (*See generally* Dkt. No. 17 [Defs.' Opp'n Papers]; Dkt. No. 27 [Hrg. Tr.].)  Furthermore, the Court has found no historical regulations of firearms in almshouses, poor-houses or poor-farms, despite its search for them in the Duke Center for Firearms Law's Repository of Historical Gun Laws.  https://firearmslaw.duke.edu/

[9]     The Court readily accepts defense counsel's representation that "HUD in 2000 published the first reports in which they noted about 200 gun-related incidents of just based on [sic] incidental discharges, not violent crime but just mishandling of firearm [sic] and somebody getting hurt."  (Dkt. No. 27, at 29 [Hrg. Tr.].)  However, Defendants do not even attempt to estimate (much less adduce any historical record of) the rate of gun violence (incidental or otherwise) in 19th and 18th century America (much less the time periods in close proximity to 1791 and 1868). As a result, based on the current record, it is somewhat difficult for the Court to accept Defendants' argument that the rate of gun violence in such places is in fact unprecedented.

analogized the firearm regulations at issue there to a *non-firearm* regulation.  *See generally Antonyuk*, 89 F.4th at 305-86; *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, at 38-71 (2022).  Indeed, to the contrary, both the Second Circuit and Supreme Court expressly tied each part of the "metrics" analysis that it would be using to a *firearm* regulation.  *See Antonyuk*, 89 F.4th at 302 ("[U]nder the more nuanced approach, whether modern and historical regulations impose a comparable burden on the *right of armed self-defense* and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry.") (internal quotation marks and citations to *Bruen* omitted; emphasis added).

Second, in any event, the Court is dutifully mindful of the Second Circuit's directive that "courts must be particularly attuned to the reality that the issues we face today are different than those faced in . . . the Founding Era, the Antebellum Era, and Reconstruction. . . .  Thus, the lack of a distinctly similar historical regulation, though (again) no doubt relevant, may not be reliably dispositive in Second Amendment challenges to laws addressing modern concerns."  *Antonyuk*, 89 F.4th at 302.  The Court is also mindful of the Supreme Court's similar directive that "the Constitution . . . must . . . apply . . . ."  *Bruen*, 597 U.S. at 28.  As a result, the Court will faithfully trace the analytical inquiry proposed by Defendants.

The Court understands the required analytical inquiry (which involves the aforementioned "metrics" analysis) to essentially set forth a proportionality test, requiring a measurement of whether the burdensomeness of the modern statute (i.e., its burdensomeness compared to its justification) is reasonably proportionate to the burdensomeness of its historical analogues (i.e.,

their burdensomeness compared to their justification).[10]  The Court further understands

Defendants' argument to be essentially that the government may currently limit one's Second

Amendment right to possess a handgun in self defense in one's publicly funded home even

though the government could not historically do so in one's home, just as the government may

currently limit one's fundamental right (presumably under the substantive Due Process Clause of

the Fourteenth Amendment) to live with one's family in a publicly funded home (e.g., based on a

family member's status as a convicted drug offender or sex offender) even though the

government could not historically do so in one's home.  (Dkt. No. 17, Attach. 8, at 25-27

[attaching pages "18" through "20" of Defs.' Opp'n Memo. of Law]; Dkt. No. 27, at 15-17 [Hrg.

Tr.].)

 For the sake of brevity, the Court will not linger on the lack of relevant similarity between

limiting a right of criminal convicts and limiting a right of law-abiding, responsible citizens.  The

bigger problem with Defendants' analogy is that they have not persuaded the Court that, during

the time periods in close proximity to 1791 and 1868, the government was *never* permitted to

limit one's fundamental right to live together with one's family.  (*See*, *e.g.*, Dkt. No. 17, Attach.

8, at 27 [attaching page "20" of Defs.' Opp'n Memo. of Law, arguing without any supporting

record citation that "the lease provision limiting certain firearms from its properties, including

---

 [10] *See Antonyuk*, 89 F.4th at 331 ("The district court rejected the State's proffered
analogues, found 'the burdensomeness of this modern regulation to be unreasonably
disproportionate to the burdensomeness of any historical analogues,' and preliminarily enjoined
enforcement of the provision. . . . We generally agree. Disclosing one's social media accounts –
including ones that are maintained pseudonymously – forfeits anonymity in that realm.
Conditioning a concealed carry license on such a disclosure imposes a burden on the right to bear
arms that is without sufficient analogue in our nation's history or tradition of firearms
regulation.").

tenants' residences should also be upheld based upon the historic analogy of the government limiting the equivalent fundamental family rights of individuals in public housing"].)  As an initial matter, it is somewhat unclear whether defense counsel is arguing that the fundamental right to family under the substantive Due Process Clause of the Fourteenth Amendment is as longstanding as the right to keep and bear arms under the Second Amendment.  (*Compare* Dkt. No. 27, at 16 [Hrg. Tr., stating, "We're not saying – fundamental family rights go as far back as the Second Amendment rights, someone's ability to own a weapon in public – own a weapon in our society"] *with* Dkt. No. 27, at 17 [Hrg. Tr., stating, "If the rights are, two rights go back as far as our country exists, to own a gun and to live with your family members, if we're allowing and if it's been upheld that a father is not allowed to be – to live with his family in his apartment in a public – in his family's public housing apartment because he's a drug offender, similarly, the analogy to limit or restrict certain types of firearms within the public, within that apartment is the same"].)

In any event, for the sake of argument, the Court will assume that the fundamental right to family preceded the right's formal recognition by the Supreme Court in 1923.[11]  After all, the Court is dutifully mindful of the Second Circuit's finding in *Antonyuk* that "it is implausible that the public understanding of a fundamental liberty would arise at a historical moment, rather than over the preceding era." *Antonyuk*, 89 F.4th at 304.  Even so, the historical record appears to indicate that, during the times in question, in at least some publicly funded almshouses, children could be separated from their families.  *See, e.g., Herkimer Cnty. v. Town of Sangerfield*, 61

_____

[11]     *See Meyer v. Nebraska,* 262 U.S. 390, 399 (1923) (first holding the "liberty" protected by the Due Process Clause of the Fourteenth Amendment includes the right of parents to "establish a home and bring up children").

21

N.Y.S. 114, 115 (Sup. Ct., Herkimer Cnty. 1899) (referencing "section 56 of the [New York State] poor law" which prohibited children to be sent as poor persons to the "county [alms] house" for support, as "protection for the children themselves"); Frank B. Sanborn, *The Management Of Almshouses In New England*, at 3 (Press of Geo. E. Ellis, 1884) ("The Connecticut almshouses have lately been relieved of many children by the establishment of county homes under a new law passed in 1883-84. . . . And our cities [in Massachusetts], which contain nearly half our almshouse population, are forbidden by law to retain children above certain ages in the almshouse."). As a result, one cannot confidently reason that the government's current limitation on one's fundamental right to family in a publicly funded home is such a permissible departure from the government's historical ability to limit one's fundamental right to family that the departure warrants a commensurate invasion of one's Second Amendment rights.

Simply stated, instead of meeting their burden of establishing that the modern regulation is consistent with the National tradition,[12] Defendants base their justification for their Firearms Ban on half of a historical analogy (to a non-firearms regulation, no less), which actually seems to undermine their case. More-persuasive historical analogues appear to be those firearms regulations that expressly made exceptions for the possession of firearms in one's home[13] or

---

[12]     *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1, at 19 (2022) ("[T]he government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."); *see, e.g., Antonyuk v. Chiumento*, 89 F.4th 271, 373 (2d Cir. 2023) ("The State once again bore the burden of proving that § 265.01-e(2)(p), the purpose of which is to reduce the threat of gun violence toward large groups in confined locations, was consistent with the National tradition.").

[13]     *See, e.g.,* Miss. Const. of 1890, art. III, § 12 ("The right of every citizen to keep and bear arms in defense of his home, person or property, or in aid of the civil power when

residence,[14] and even one's boarding house.[15]  They do not include regulations prohibiting

firearms merely in government buildings.  *See Columbia Hous. & Redevelopment Corp. v.*

*Braden*, 663 S.W.3d 561, 568 (Tenn. Ct. App. 2022) ("[W]e cannot say that an individual's

public housing unit is analogous to that of other established sensitive government buildings [for

purposes of *Bruen*]. . . . [W]e conclude that a total ban on the ability of law-abiding

residents—like Mr. Braden—to possess a handgun within their public housing unit for the

purpose of self-defense is unconstitutional under the Second Amendment.").[16]

---

thereto legally summoned, shall not be called in question, but the legislature may regulate or forbid carrying concealed weapons."); 1876 Colo. Const. 30, art. II, § 13 ("That the right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when hereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons."); Mo. Const. of 1875, art. II, § 17 ("That the right of no citizen to keep and bear arms in defense of his home, person and property, or in aid of the civil power, when hereto legally summoned, shall be called in question; but nothing herein contained is intended to justify the practice of wearing concealed weapons.").

[14]     *See, e.g.*, "An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons," reprinted in *Acts of the Legislative Assembly of the Territory of New Mexico, Twenty-Seventh Session* § 1 (Feb. 18, 1887) (prohibiting the carrying of a deadly weapon "except it be in his or her residence, or on his or her landed estate").

[15]     *See, e.g.*, "An Ordinance Relating to the Carrying of Fire Arms and Other Deadly Weapons," *The Abilene Chronicle* (Kansas) § 1 (May 12, 1870) (prohibiting the carry of firearms "except to bring the same and forthwith deposit it or them at their house, boarding house, store room or residence").

[16]     The Court notes that, while their orders are of little precedential effect, at least two other federal district courts have approved stipulations enjoining similar public-housing lease provisions as unconstitutional under the Second Amendment.  *See Doe v. East St. Louis Housing Authority*, 18-CV-0545, Order of Final Judgment and Permanent Injunction, at 2 (S.D. Ill. filed Apr. 11, 2019) ("The Court concludes that the Stipulation should be approved, and judgment should be entered in favor of Plaintiffs."); *Guy Montag Doe v. San Francisco Housing Authority*, 08-CV-03112, 2009 WL 86381 (N.D. Cal. Jan. 12, 2009) ("Defendant SFHA shall not at any time enforce the provisions of [the Model Lease Agreement] relating to the lawful possession of firearms and other arms or weapons.").

Third, Defendants' justification also teeters precariously on their assertion that the Firearms Ban is not "categorical" in nature (given that tenants may supposedly possess rifles, shotguns and crossbows on CHA property without breaching the lease).  Even if the Court were persuaded by this assertion,[17] the Supreme Court in *Heller* specifically rejected it as a ground for finding such a firearms regulation constitutional:

> It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed. It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon. There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police. Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.

*District of Columbia v. Heller*, 554 U.S. 570, 629 (2008), *aff'g sub nom. Parker v. District of Columbia,* 478 F.3d 370, 400 (D.C. Cir.2007) ("The District contends that since it only bans one type of firearm, 'residents still have access to hundreds more,' and thus its prohibition does not implicate the Second Amendment because it does not threaten total disarmament. We think that argument frivolous. It could be similarly contended that all firearms may be banned so long as sabers were permitted."); *cf. Caetano v. Massachusettes*, 777 U.S. 411, 421 (2016) (Alito, J., concurring) ("[T]he right to bear other weapons is 'no answer' to a ban on the possession of

---

[17]     To be clear, the Court is not persuaded by this assertion for the reasons stated by Plaintiffs.

protected arms.").[18]  Indeed, when pressed on the issue during oral argument in this action,

defense counsel (as he must, given his duty of candor to the Court) expressly conceded that

"harmonizing" the Firearms Ban with *Heller* is "problematic."  (Dkt. No. 27, at 20 [Hrg. Tr.].)

As a result, he further conceded, "the lease [which was probably drafted before *Helle*r came

down] should be revised to update it" to comply with *Heller*, to which "it stands adverse."  (*Id*. at

29-30.)[19]

Fourth, and finally, the Court does not understand Plaintiffs to be arguing that they may,

under the Second Amendment, bear a firearm in self-defense in the common areas of CHA

property.  (Dkt. No. 27, at 23 [Hrg. Tr., stating, "[C]ommon areas are not even at issue here.

Although I would note that obviously the ability to transport your firearm to the shooting range or

to go hunting or wherever you're going, recreation, obviously that does involve transporting your

firearm in a case from your public housing unit to your car, to get to wherever you're going. So of

course, the common areas would necessarily be an artery of transportation of locked and securely

stored firearms for the plaintiffs to move their firearms from point A to point B, point A being

the home. . . .  The firearms have to be movable"].)[20]  Rather, the Court understands Plaintiffs to

_____

[18]     The Court notes that it must flatly reject Defendants' argument that the individual
Plaintiffs do not need handguns in self-defense in their homes because they possess cross-bows,
as if a home invader typically pauses long enough to nibble the leaves of a potted fern far enough
away from a homeowner to be stopped by a feathered bolt.

[19]     Defense counsel's supposition that the Firearms Ban pre-dated *Heller* appears
confirmed by the record evidence.  (Dkt. No. 17, Attach. 1, at ¶ 10 [Diiorio Decl., stating, "I have
been employed by CHA since 2005. In my time as an employee of CHA, there has always been a
lease provision that restricted firearms and other weapons as defined by the laws of the State of
New York."].)

[20]     *Cf. Doe v. Wilmington Housing Authority*, 880 F. Supp.2d 513, 534-35 (D. Del.
2012) ("In the Court's view, this case presents exactly the type of situation that merits the

be arguing that merely that they may, under the Second Amendment, securely transport their firearms to and from their home through the common areas of CHA property, in compliance with New York State law. As a result, the injunction that the Court issues is narrowly tailored to preserve that right.

For all of these reasons, the Court finds that, based on the current record, Plaintiffs have demonstrated a substantial likelihood of success on the merits of their first claim.

## B.    Strong Showing of Irreparable Harm

After carefully considering the matter, the Court finds that Plaintiffs have demonstrated a strong showing of irreparable harm, for the reasons stated by them in their memoranda of law. *See, supra,* Parts I.C.1. and I.C.3. of this Decision and Order.  To those reasons, the Court adds one point (which is intended to supplement and not supplant Plaintiffs' reasons).

Each of the three individual Plaintiffs has sworn under oath that he is "a peaceable, law-abiding citizen who is not disqualified in any way from ownership, possession, and use of firearms.  But for the Firearms Ban, I would own and possess firearms for self-defense and other lawful purposes in my home."  (Dkt. No. 2, Attach. 5, at ¶ 4 [Hunter Decl.]; Dkt. No. 2, Attach. 6, at ¶ 4 [Irwin Decl.]; Dkt. No. 2, Attach. 7, at ¶ 8 [Merrin Decl.].)  Meanwhile, the individual Defendant has sworn under oath that "some of [the CHA's] tenants have known criminal histories which did not disqualified [sic] them from receiving a public housing subsidy."  (Dkt.

---

application of intermediate scrutiny. The Revised Policy, including the Common Area Provision, does not impose a complete ban, expressly recognizes a right to possess firearms in the home, and provides an exception for self-defense. Hence, the Revised Policy preserves the 'core' of Plaintiffs' Second Amendment rights. . . . [T]he Revised Policy does not severely limit those rights inside the home—or come close to the level of infringement struck down in *Heller* . . . ."); *rev'd in part on other grounds*, 568 F. App'x 128 (3d Cir. 2014).

No. 17, Attach. 1, at ¶ 7 [Diiorio Decl.].)[21]  As a result, even if the individual Plaintiffs had to

demonstrate some special need for self-protection distinguishable from that of the general

community in order to show irreparable harm (a finding the Court has trouble rendering in light

of *Bruen*), the Court would reject Defendants' argument that the irreparable harm experienced by

the individual Plaintiffs is merely speculative or "conclusory."

        For all of these reasons, the Court finds that Plaintiffs have demonstrated a strong

showing of irreparable harm.

### C.    Balance of Equities and Service of Public Interest

        Finally, after carefully considering the matter, the Court finds that the balance of equities

and public interest both overwhelmingly favor granting injunctive relief, for the reasons stated by

Plaintiffs in their memoranda of law.  *See, supra,* Parts I.C.1. and I.C.3. of this Decision and

Order. To those reasons, the Court adds only two points.

        First, Defendants have neither cited nor adduced any admissible record evidence in

support of their argument that "there are more tenants [who] prefer the restrictions to remain in

place until at least the conclusion of this litigation."  (Dkt. No. 17, Attach. 8, at 32 [attaching

page "25" of Defs.' Opp'n Memo. of Law]; *see generally* Dkt. No. 17, Attach. 1-7 [Defs.'

Record Evidence].)

        Second, Defendants have also adduced no admissible record evidence in support of their

argument that the imposition of an injunction would "allow all firearms in" to CHA property.

(Dkt. No. 27, at 29-30 [Hrg. Tr., stating, "Anybody [could] go out to whatever shop they want to

---

        [21]      Indeed, Defendants appear to concede that there exists on CHA properties "the
potential problem of gun violence."  (Dkt. No. 17, Attach. 8, at 27 [attaching page "20" of Defs.'
Opp'n Memo. of Law].)

and get whatever weapon they want. . . . To issue a temporary restraining order enjoining us from

that limited restriction opens up the door and opens up the floodgate to bringing any kind of

weapon in that you want"];  *see generally* Dkt. No. 17, Attach. 1-7 [Defs.' Record Evidence].)

To the contrary, the injunction is narrowly tailored to the enforcement of the Firearms Ban in

CHA dwelling units (and during the secure transportation of firearms to and from those units, in

accordance with New York State law).  Still in effect are the restrictions imposed by such statutes

as New York's Secure Ammunition and Firearms Enforcement Act of 2013 and  New York's

Concealed Carry Improvement Act.

### D.    Security

Plaintiffs should be, and are, excused from giving security because there has been no

proof of any "costs and damages" that would have been sustained by any Defendant "found to

have been wrongfully enjoined or restrained" under Fed. R. Civ. P. 65(c).[22]  The Court adds only

that Defendants have not adduced evidence of any damages for which they might be liable (as

opposed damages for which the individual Plaintiffs might be liable) in the event of an accidental

discharge of a weapon by the individual Plaintiffs "through a wall" during the pendency of this

---

[22]    *See Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir.1997) (affirming district court decision to not require a franchisor-plaintiff to post a bond for either of its injunctions because the franchisee-defendants "would not suffer damage or loss from being forced to arbitrate in lieu of prosecuting their state-court cases"); *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) ("Defendants have not shown that they will likely suffer harm absent the posting of a bond by [Plaintiff]."); *Clarkson Co. v. Shaheen,* 544 F.2d 624, 632 (2d Cir.1976) ("[B]ecause, under Fed. R. Civ. P. 65[c], the amount of any bond to be given upon the issuance of a preliminary injunction rests within the sound discretion of the trial court, the district court may dispense with the filing of a bond."); *Ferguson v. Tabah*, 288 F.2d 665, 675 (2d Cir.1961) ("[The phrase 'in such sum as the court deems proper'] indicates that the District Court is vested with wide discretion in the matter of security and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm, or where the injunctive order was issued "to aid and preserve the court's jurisdiction over the subject matter involved.").

injunction.  (Dkt. No. 27, at 31 [Hrg. Tr.]; *see generally* Dkt. No. 17, Attach. 1-7 [Defs.' Record Evidence].)

      **ACCORDINGLY**, it is

      **ORDERED** that the Clerk of Court shall amend the docket sheet to correct the spelling of Defendant Diiorio's last name, in accordance with note 1 of this Decision and Order; and it is further

      **ORDERED** that Plaintiffs' consolidated motion for a temporary restraining order and preliminary injunction (Dkt. No. 2) is **<u>GRANTED</u>**; and it is further

      **ORDERED** that Defendants, their officers, agents, servants, employees and attorneys and those acting in concert with them, are **TEMPORARILY ENJOINED** from taking any action to enforce, or otherwise requiring any person or entity to comply with, the Firearms Ban as set forth in "Tenant's Obligations" in Article IX, Section (p) of Defendants' standard Residential Lease Agreement, pending final resolution of this action, **EXCEPT** to the extent that it prohibits the display, use or possession of firearms in the common areas, grounds or parking areas of the property of CHA in violation of New York State law; and it is further

      **ORDERED** that Plaintiffs are **EXCUSED** from giving security.

Dated: January 30, 2024
      Syracuse, New York

Glenn T. Suddaby
U.S. District Judge