# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------X

ROBERT HUNTER, ELMER IRWIN,
DOUG MERRIN, and THE SECOND
AMENDMENT FOUNDATION,

        Plaintiffs,

-against-

CORTLAND HOUSING AUTHORITY
~~and~~ ELLA M. DIIORIO, personally
and in her official capacity as Executive
Director of CORTLAND HOUSING
AUTHORITY, HEATHER WASLEY,
personally and in her official capacity as
Leased Housing Coordinator of CORTLAND
HOUSING AUTHORITY, and CAROLE
PRESTON, personally and in her former
official capacity as Leased Housing
Coordinator of CORTLAND HOUSING
AUTHORITY,

        Defendants.

-----------------------------------------------------X

Case 5:23-cv-01540-GTS-ML

~~FIRST~~SECOND
**AMENDED COMPLAINT**

**Jury Trial Demanded**

Plaintiffs, Robert Hunter ("Hunter"), Elmer Irwin ("Irwin"), Doug Merrin ("Merrin")

(together, the "Individual Plaintiffs") and The Second Amendment Foundation ("SAF"), by and

through their attorneys, Bochner PLLC, bring this action against Defendants Cortland Housing

Authority ("CHA~~") and~~"), Ella M. Diiorio, personally and in her official capacity as Executive

Director of CHA ("Diiorio"), Heather Wasley, personally and in her official capacity as Leased

Housing Coordinator of CHA ("Wasley") and Carole Preston, personally and in her official

capacity as former Leased Housing Coordinator of CHA ("Preston"), and allege as follows:

## INTRODUCTION

1.    CHA, a New York State public housing authority that receives federal funding,

1

***categorically bans*** the possession of "any firearms (operable or inoperable) or other weapons as defined by the laws and courts of the State of New York anywhere on the property of CHA," where CHA's public housing tenants, including the Individual Plaintiffs, reside (the "Firearms Ban" or the "Ban"). The Ban, specified in CHA's uniform Residential Lease Agreement (the "RLA"), and enforced on pain of eviction, lease termination, and loss of subsidy and housing benefits, covers, most notably, all handguns (the term "handguns" hereinafter includes and refers to pistols and revolvers), and also other types of firearms, including rifles and shotguns. This is a flagrant violation of the public housing tenants' fundamental right to keep and bear arms in their homes under the Second Amendment to the United States Constitution, which provides:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. CONST. amend. II.

2.      Incorporated against the states through the Due Process Clause of the Fourteenth Amendment (U.S. CONST. amend. XIV, § 1), *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Second Amendment guarantees "an individual right to keep and bear arms," *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). It is "a fundamental constitutional right guaranteed to the people," *id.*, which is and has always been key to "our scheme of ordered liberty." *McDonald*, 561 U.S. at 767-68.

3.      "*Heller* . . . demands a test rooted in the Second Amendment's text, as informed by history." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 19 (2022) (citing *Heller*, 554 U.S. 570). Consistent with this demand, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 19.

4.      As set forth in greater detail below, because of the Firearms Ban, CHA's tenants,

including the Individual Plaintiffs, are completely barred from exercising their fundamental right to keep and bear arms, including handguns, in their "*home*, where the need for defense of self, family, and property is *most acute*." *Heller*, 554 U.S. at 628 (emphases added).

5.      This is not a close case. Rather, CHA has blatantly thumbed its nose at the Supreme Court of the United States, and will continue to do so absent court intervention. A governmental entity simply may not impose a wholesale ban on the possession of handguns and other firearms in the home, *full stop*. *See Heller*, 554 U.S. at 576, 635-636 (holding that the District of Columbia's "total ban on handguns, as well as its requirement that firearms in the *home* be kept nonfunctional even when necessary for self-defense" violated the Second Amendment) (emphasis added); *Id*. at 627 ("As we have said, the law totally bans handgun possession in the *home*.") (emphasis added).

6.      It is beyond cavil that there is *no* historical tradition of banning firearms possession and ownership in American homes, including handguns.

7.      In fact, as Defendants readily conceded after Plaintiffs commenced this action, "[t]he guarantees of the Second Amendment are at their *zenith* within the home." (*See* Defendants' Memorandum of Law in Support of Motion to Dismiss Plaintiff Second Amendment Foundation's Complaint and in Opposition to Plaintiffs' Application for Injunctive Relief, ECF 17-8 at p. 16). (Emphasis added).

8.      The Firearms Ban is not only unconstitutional as applied to the Individual Plaintiffs; the Ban is unconstitutional on its face. Accordingly, Plaintiffs bring this action to enjoin enforcement of the Ban and to obtain a declaration that the Ban is facially unconstitutional.

9.      Moreover, Defendants have not confined their frightening overreach to trampling on the Second Amendment; they've also violated the First Amendment. As set forth below, when Hunter posted a comment on CHA's official Facebook page (the "CHA Facebook Page" or the "Page") on February 15, 2023 expressing his disagreement with the Firearms Ban, Defendants

3

promptly deleted his message because they disapproved of Hunter's viewpoint and sought to silence him; Defendants then banned him from access to the CHA Facebook Page, again because of their disapproval of his viewpoint and desire to silence him (the "Firearms Censorship" or the "Censorship"). Hunter remains banned from access at the present time. Accordingly, Hunter also brings this action to enjoin the Censorship and to obtain a declaration that the Censorship is unconstitutional under the First Amendment.

10.     Finally, the Firearms Ban violates the Individual Plaintiffs' right to equal protection of the law secured by the Equal Protection Clause of the Fourteenth Amendment, as the Ban denies them their individual rights of firearms ownership and possession as secured by the Second Amendment, due to their age, financial disadvantage, circumstances of residing in public housing, and disability. Accordingly, the Individual Plaintiffs also bring this action to enjoin this violation of the right to equal protection and to obtain a declaration that this violation of the right to equal protection is unconstitutional under the Equal Protection Clause.

## **PARTIES**

11.     Plaintiff Hunter is a 51-year-old natural person and a citizen of the state of New York, residing as a CHA tenant in Unit #B4 at the CHA senior public housing apartments located at 37 Galatia Street, Marathon, New York (the "Galatia Apartments"). Unit #B4 is Hunter's full-time home and only residence. Hunter duly executed the RLA prior to his assumption of residency at Galatia Apartments. Hunter is a peaceable, law-abiding citizen who is not disqualified in any way from ownership, possession, and use of firearms, including handguns. But for the Firearms Ban, Hunter would own and possess firearms for self-defense and other lawful purposes in his home, including and especially handguns.

12.     Plaintiff Irwin is a 57-year-old natural person and a citizen of the state of New York, residing as a CHA tenant in Unit #B3 at the Galatia Apartments. Unit #B3 is Irwin's full-time

home and only residence. Irwin duly executed the RLA prior to his assumption of residency at Galatia Apartments. Irwin is a peaceable, law-abiding citizen who is not disqualified in any way from ownership, possession, and use of firearms, including handguns. But for the Firearms Ban, Irwin would own and possess firearms for self-defense and other lawful purposes in his home, including and especially handguns.

13.    Plaintiff Merrin is a 71-year-old natural person and a citizen of the state of New York, residing as a CHA tenant in Unit #A2 at the Galatia Apartments. Unit #A2 is Merrin's full-time home and only residence. Merrin duly executed the RLA prior to his assumption of residency at Galatia Apartments. Merrin is a peaceable, law-abiding citizen who is not disqualified in any way from ownership, possession, and use of firearms, including handguns. But for the Firearms Ban, Merrin would own and possess firearms for self-defense and other lawful purposes in his home, including and especially handguns.

14.    Plaintiff SAF is a 501(c)(3) nonprofit educational foundation incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF seeks to preserve the effectiveness of the Second Amendment through education, research, publishing, and legal action programs focused on the constitutional right to keep and bear arms, to possess firearms and firearms ammunition, and the consequences of gun control. SAF's mission statement reads:

> The Second Amendment Foundation is dedicated to promoting a better understanding about our Constitutional heritage to privately own and possess firearms. To that end, we carry on many educational and legal action programs designed to better inform the public about the gun control debate.

14.    SAF has over 720,000 members and supporters nationwide, including thousands of members in New York, among them all three Individual Plaintiffs. SAF brings this action on behalf of those members, including the Individual Plaintiffs. These members of SAF, including the

Individual Plaintiffs, are adversely and directly harmed by Defendants' enforcement of the Firearms Ban.

15.     SAF has diverted significant resources from its limited budget to bring the instant action and to seek relief against the unconstitutional actions of Defendants, including enforcement of the Firearms Ban and retaliation against Plaintiff Hunter for his involvement in this litigation. Indeed, SAF has allocated a significant portion of its limited budget to this litigation, including by filing the original Complaint, the Motion for a Temporary Restraining Order and a Preliminary Injunction, the First Amended Complaint, this Second Amended Complaint (together with its accompanying Motion to Amend), and by participating in discovery thus far. As such, SAF is unable to invest its full budget into other causes, including educational programs and legal action programs designed to share information about the ongoing gun control debate.

16.     Although SAF participates in other litigations, diversion of resources to contest the enforcement of the Firearms Ban, which brazenly contradicts the precedent clearly set forth by the Supreme Court in *Heller, McDonald,* and *Bruen*, detracts from SAF's ability to fund and participate in other disputes related to more nuanced Second Amendment issues. In contrast, the dispute at issue in this action is not nuanced—Defendants are patently violating the Constitution, and are thereby forcing SAF to divert resources that it never should have been compelled to expend.

17.     To accomplish its mission and bring awareness to Second Amendment rights, SAF relies in part on promotion via word of mouth, which is largely shared by its members including the Individual Plaintiffs.

18.     Enforcement of the Firearms Ban will adversely impact SAF's ability to execute its mission, by limiting the ownership and possession of firearms by CHA tenants and discouraging

6

CHA tenants from exercising their Second Amendment rights by threatening adverse consequences up to and including eviction from CHA's government funded housing program for exercising those rights.

19.    And, as demonstrated by CHA's Retaliatory Letter to Hunter (defined *infra*), delivered to him by Defendants in retaliation for his staunch advocacy of constitutional rights, Hunter, a member of SAF, could face significant legal and financial consequences if he were to exercise his rights while living as a tenant at the Galatia Apartments—even after this Court preliminarily enjoined the Firearms Ban. *See* ECF 28 (granting Plaintiffs' Motion for Preliminary Injunction and enjoining Defendants from "taking any action to enforce, or otherwise requiring any person or entity to comply with, the Firearms Ban as set forth in "Tenant's Obligations" in Article IX, Section (p) of Defendants' standard Residential Lease Agreement.") (the "Preliminary Injunction").

20.    CHA's actions to stifle speech related to the Second Amendment, including Hunter's multiple and repeated complaints related to the Firearms Ban, shared in person, via email, and via Court filings, impede SAF's ability to accomplish its mission and promote a better understanding about our Constitutional heritage to privately own and possess firearms.

15.21.  Defendant CHA is a governmental entity created by the State of New York, funded primarily by the United States Department of Housing and Urban Development ("HUD"), and self-administered. Specifically, CHA is a municipal housing authority existing under the laws of the State of New York, created by N.Y. Pub. Hous. Law § 447, which provides, in pertinent part: "A municipal housing authority, to be known as the Cortland Housing Authority, is hereby created and established for the city of Cortland in the county of Cortland . . . . It shall have all the powers and duties now or hereafter conferred by this chapter upon municipal housing authorities." As set

forth on CHA's website, CHA, being a public (municipal) housing authority (PHA), participates in the federal Public Housing program "designed to house eligible persons in affordable, decent, safe and sanitary apartments that are owned by the [CHA]." As also provided on CHA's website, HUD "contracts with [CHA] to administer" public housing "in accordance with HUD regulations and provides an operating subsidy to [CHA]", which "must create written policies that are consistent with HUD regulations." CHA administers multiple public housing properties in Cortland County. As provided on the "NY Connects" website maintained by the State: "[CHA] has 380 units for Federally-subsidized Public Housing located throughout Cortland County. All of the public housing properties administered by CHA are held by a Declaration of Trust with HUD as the named trustee. CHA housing units for seniors and disabled individuals are located in the City of Cortland, the Villages of Homer, McGraw and Marathon, and the Towns of Cincinnatus and Truxton. Among these housing units are the Galatia Apartments at which the Individual Plaintiffs reside, which consist of sixteen one-bedroom senior apartments available only those individuals who are at least 62 years of age or disabled.

16.22.  Defendant Diiorio, sued personally and in her official capacity, is the Executive Director of CHA, and in that capacity, directs, implements, and supervises the policies and rules of CHA, including the Firearms Ban and the Firearms Censorship.

23.    Defendant Wasley, sued personally and in her official capacity, is the Leased Housing Coordinator of CHA, and in that implements and enforces the policies and rules of CHA, including the Firearms Ban and the Firearms Censorship.

24.    Defendant Preston, sued personally in her former official capacity, was employed by CHA in various roles including Tenant Relations Specialist, Housing Coordinator, and Leased Housing Coordinator from 2002 until approximately 2016, and in that capacity executed tenant

intake processes and enforced the policies and rules of CHA, including the Firearms Ban.

## JURISDICTION AND VENUE

17.25.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343, which confer original jurisdiction on federal district courts to hear suits alleging the violation of rights and privileges under the United States Constitution.

18.26.  This action, based on violations of Plaintiffs' constitutional rights, is brought under 42 U.S.C. § 1983 and seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, as well as attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

19.27.  This Court has personal jurisdiction over the Defendants since they are situated within the Northern District of New York.

20.28.  Venue is proper in this District under 28 U.S.C. § 1391(b)(1), because Defendants are residents of the state of New York, where the Northern District of New York is located; or, alternatively, under 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

~~I.~~      The Public Benefits Received by CHA Tenants and Their

I.

**Reservation of All Constitutional Rights Upon Receipt of These Benefits**

~~21.~~29.  Eligibility for most of CHA's housing units, including the Galatia Apartments, is means-based and available only to individuals with an annual income at or below certain federally-mandated thresholds.

~~22.~~30.  The Individual Plaintiffs and other CHA tenants receive two public benefits from Defendants, in the following order: first, CHA partially covers the cost of CHA public housing through a subsidy to the individual tenant; and, second, CHA provides residency in CHA public housing to the tenant.

~~23.~~31.  Thus, upon providing the housing subsidy to an individual, CHA must then enter into a lease with that individual, giving rise to a subsequent property interest and tenancy in a CHA housing unit.

~~24.~~32.  The RLA is the uniform lease that CHA requires the Individual Plaintiffs and all other CHA tenants to execute before they assume residency in a CHA public housing unit. (A true and accurate copy of the RLA is attached hereto as **Exhibit A**).

~~25.~~33.  When Defendant offers and provides the benefits of subsidy and residency to CHA tenants, including the Individual Plaintiffs, Defendants cannot seek forfeiture or waiver of the tenants' rights under the Constitution in exchange for either of these benefits. Although Defendants have no obligation to offer these benefits to any specific individual in the first instance, once Defendants *do* undertake to offer and provide the benefits of subsidy and residency to a specific individual, Defendants do so knowing that tenants reserve *all* of their rights under the Constitution. Indeed, prior to instituting the Firearms Ban and then again after they received complaints from

10

Plaintiff Hunter about the Ban (as set forth below), Defendants knew or should have known that under the unconstitutional conditions doctrine, they cannot place a condition (such as giving up the right to keep and bear arms) on the receipt of a benefit or subsidy that infringes on their tenants' constitutionally protected rights. This is true even if CHA has no obligation to offer the benefit or subsidy in the first place. *See, e.g., Alliance for Open Soc'y Int'l v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 231 (2d Cir. 2011) (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)).

26.34.  As a corollary to Defendants' obligation to refrain from violation of the unconstitutional conditions doctrine, when CHA tenants, including the Individual Plaintiffs, accept and receive the benefits of subsidy and residency, they reserve *all* of their rights under the Constitution. CHA tenants do not forfeit or waive any of these rights, including the right to keep and bear arms, the right to freedom of speech, the right to petition for redress of grievances, and the right to equal protection under the law.

II.  **The Firearms Ban**

27.35.  In violation of the Second and Fourteenth Amendments, and contrary to the unconstitutional conditions doctrine, all CHA tenants who receive the benefits of subsidy and residency, including the Individual Plaintiffs, must abide by the Firearms Ban, on pain of eviction, lease termination, and loss of subsidy and housing benefits.  –

28.36.  The Firearms Ban is set forth in "Tenant's Obligations" in Article IX of their RLAs. Article IX, section (p), the Ban, provides that the "**Tenant shall be obligated: (p) Not to display, use, or possess or allow members of Tenant's household or guest to display, use or possess any firearms (operable or inoperable) or other weapons as defined by the laws and courts of the State of New York anywhere on the property of CHA**." (Emphasis added).

11

29.37.   Since "the property of CHA" is home for all CHA tenants, including the Individual Plaintiffs, the Ban categorically prevents them from possessing any firearms in their homes. This in turn eviscerates their core Second Amendment rights—the right to own legal firearms of their choice (including and especially handguns), to possess those firearms in the home, and the right to armed self-defense.

38.        ~~III.~~  The Firearms Ban applies to all firearms, regardless of their make, model, features, caliber, or status under state and/or federal law. This was affirmed by Preston, who confirmed that "pursuant to th[e] Firearms Ban, **all firearms** were banned on CHA property" in her deposition in this action on May 8, 2024. (Emphasis added).

**III.    Crime at CHA Properties**

39.    As a provider of government-funded housing, CHA often offers tenancy to individuals that would be otherwise ineligible for housing for a variety of reasons. In some cases, individuals may be elderly or disabled and may not have the ability to support themselves at a traditional job. In other cases, tenants may have criminal histories that preclude them from securing private housing.

40.    Many tenants of CHA have a history of violent criminal conduct, including tenants at the Galatia Street facility that houses the Individual Plaintiffs. Preston's deposition testimony indicated that the only way in which a person would be categorically excluded from tenancy with CHA was if they were a registered sex offender. She also testified that "[i]f people had criminal backgrounds, it was possible to get public housing but it depended on the crime, the severity, [and] how recent they were."

41.    CHA offered and continues to offer housing to individuals who have a history of violent crime.

42.     CHA offered and continues of offer housing to individuals who have a history of drug use.

43.     CHA offered and continues of offer housing to individuals who have a history of non-violent crime.

44.     Individuals who make a majority of their income via illegitimate means, such as selling drugs, are eligible for CHA housing even if their actual income exceeded the threshold for CHA tenancy, and even where they have a history of arrests and/or convictions for possession or sale of drugs.

45.     Preston's deposition testimony made clear that there is a pattern of criminal conduct in and around CHA facilities. Preston confirmed that during her employment with CHA, she was aware of a variety of criminal conduct that had taken place at CHA, including elder abuse, domestic violence cases resulting in orders of protection, possession and use of hard drugs, and burglary, among others.

46.     Indeed, the security at CHA's facilities was so lacking that even CHA's own office was subject to a break in. Preston testified that on one occasion, a non-tenant of CHA was able to access and burglarize the administrative office at night. Preston also testified that she was aware of multiple instances in which CHA tenants were the victims of break-ins and theft in their homes, all while living under CHA's management.

47.     Additionally, Preston testified that during her employment with CHA, she was aware of multiple domestic violence incidents including assaults, several of which resulted in orders of protection being issued against the attackers.

48.     Further, Preston testified that she personally handled reports of violent activity at CHA, and that these reports sometimes required her and CHA to call the Cortland City Police for

intervention.

49. In addition to the violent acts being perpetrated on CHA property, Preston testified that she received reports of drug crimes, and that the frequency of those reports was increasing before she left CHA in 2015. Preston testified that she was aware of and processed reports of CHA tenants using marijuana, methamphetamines, and unidentified drugs administered with needles during her employment.

50. As a result of CHA's acceptance of tenants with violent criminal histories, CHA properties were and continue to be rife with criminal activity. Indeed, the Cortland City Police indicated that they were "familiar with" several tenants at the Galatia Street facility when another tenant reported drug activity by these tenants on CHA property.

51. Thus, CHA properties are, by Preston's own admission, dangerous places. Individuals who visit or reside in CHA properties are subject to a higher risk of becoming a victim to violent criminal conduct than in other public spaces. As a result of CHA's failure to take steps to ensure or even promote the safety of its residents, law-abiding tenants of CHA have a special need to be able to defend themselves against violent crime, including by possession of a firearm in their home—under *Bruen*, though, no showing of special need is required to possess firearms for self-defense.

**IV.     The Preliminary Injunction in this Action**

52. Plaintiffs made a motion for a preliminary injunction and a temporary restraining order enjoining Defendants from enforcing the Firearms Ban. [ECF 2], which was granted (the Preliminary Injunction). [ECF 28].

53. As part of its written order granting the Plaintiffs' motion for temporary restraining order and preliminary injunction, the Court addressed the merits of Plaintiff's claims, finding that

14

"Plaintiffs have demonstrated a substantial likelihood of success on the merits." *See generally, id.* at 16-24.

54.     The Court rejected Defendants' arguments that "both the fact of public housing and the rate of gun violence therein are wholly unprecedented, necessitating the 'more nuanced approach' permitted by the Second Circuit in *Antonyuk*[1] and the Supreme Court in *Bruen*." *Id.* at 18. Similarly, the Court rejected Defendants' attempted analogy to a non-firearms regulation. *Id.*

55.     Moreover, Defendants' counsel acknowledged the fundamental incompatibility between the Firearms Ban and the Supreme Court's *Bruen* opinion. The Court made a point of referencing the fact that "when pressed on the issue during oral argument in this action, defense counsel (as he must, given his duty of candor to the Court) expressly conceded that 'harmonizing' the Firearms Ban with *Heller* is 'problematic.' " *Id.* at 25 (internal citation omitted).

56.     Defendants also bizarrely argued that the individual Plaintiffs do not need handguns in self-defense in their homes because they may possess crossbows. ECF 17-8 at 10. As with Defendants' other arguments, the Court pointed out the flaws therein, noting that a crossbow may be a useful home defense weapon "if a home invader typically pauses long enough to nibble the leaves of a potted fern far enough away from a homeowner to be stopped by a feathered bolt." ECF 28 at n. 18.

57.     Plaintiffs have made a demonstration of the exceptional merits of this case. In contrast, this Court has found that "instead of meeting their burden of establishing that the modern regulation is consistent with the National tradition, Defendants base their justification for their Firearms Ban on half of a historical analogy (to a non-firearms regulation, no less), which actually seems to undermine their case." *Id.* at 22.

---

[1] *Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023).

15

58.     Further, this Court held that Plaintiffs have demonstrated a strong showing of irreparable harm, and that "the balance of equities and public interest both overwhelmingly favor granting injunctive relief." *Id.* at 27.

59.     In sum, this Court has determined that, as a preliminary matter, the Firearms Ban violates the Constitution of the United States, that the Plaintiffs will suffer irreparable harm in the absence of judicial relief, and has summarily rejected Defendants' arguments in favor of the Firearms Ban.

## V.     **The Demise of Similar Bans**

~~30.~~60.  The circumstances of this action are distinctly similar to those of *Guy Montag Doe* v. *San Francisco Housing Authority* ("SFHA"), No. CV-08-03112, 2009 WL 86381 (N.D. Cal.).

~~31.~~61.  In *Guy Montag*, the SFHA, just like CHA, imposed a firearms ban on its public housing tenants through the lease agreement. Specifically, in 2005, "[SFHA] formally amended its Model Lease Agreement to prohibit the possession of firearms and ammunition in the home by residents of public housing in the City and County of San Francisco." 2009 WL 86381.

~~32.~~62.  Pursuant to settlement of the matter, the parties stipulated, *inter alia*, that "Defendant SFHA shall not at any time enforce the provisions of [the Model Lease Agreement] relating to the lawful possession of ammunition" and "Defendant SFHA shall not at any time enforce the provisions of [the Model Lease Agreement] relating to the lawful possession of firearms and other arms or weapons." 2009 WL 86381.

~~33.~~63.  The circumstances of this action are also distinctly similar to those of *N. Doe* v. *East St. Louis Housing Authority* ("ESLHA"), No. 3:18-cv-545 (S.D. Ill.), an action commenced on March 7, 2018.

16

~~34.~~64.  In *N. Doe*, the ESLHA, just like SFHA and CHA, imposed a firearms ban on its public housing tenants through the lease agreement. The ban provided, *inter alia*, that tenants were not permitted to "display, use, or possess or allow members of [DOE's] household or guests to display, use, or possess any firearms, (operable or inoperable) . . . anywhere in the unit or elsewhere on the property of the Authority."

~~35.~~65.   On April 3, 2019, the parties in *N. Doe* entered into a "Stipulation to Entry of Final Judgment and Permanent Injunction," whereby the parties stipulated "that the Court shall issue an Order . . . enjoining Defendants . . . from enforcing" the sections of the East St. Louis Housing lease agreement that banned firearms for "residents who are permitted under Illinois law to possess a firearm, to possess functional firearms that are legal in their jurisdiction for self-defense and defense of others in their residences, provided they are otherwise-qualified to do so." That same day, the parties filed an "Agreed Motion for Entry of Final Judgment and Permanent Injunction" requesting that the Court enter final judgment and a permanent injunction in accordance with the Stipulation.

~~36.~~66.  On April 11, 2019, the Court entered an "Order of Final Judgment and Permanent Injunction" permanently enjoining enforcement of the offending lease provisions, and required the defendants to "take the necessary steps to strike or amend the challenged sections of the ESLHA Lease, such that the ESLHA will no longer prohibit Plaintiffs, and other ESLHA residents who are otherwise qualified under Illinois law to possess firearms, to possess functional firearms, that are legal in their jurisdiction, in their residences."

~~37.~~67.  The Second Amendment requires the same result in this action as in *Guy Montag* and *N. Doe*.

~~IV.~~ 

17

### VI.    Unconstitutional and Illegal Purchases of Firearms from CHA Tenants at a Significant Discount and Offers of Same

68.    In her various roles with CHA, Preston was charged with enforcing the provisions of the RLA, including the Firearms Ban.

69.    As part of her roles as Housing Coordinator and Leased Housing Coordinator with CHA, Preston conducted interviews of prospective tenants, and handled tenant screening and intake.

70.    As part of her roles as Housing Coordinator and Leased Housing Coordinator with CHA, Preston informed tenants of the "Tenant Obligations" outlined in the RLA, including the Firearms Ban.

71.    While employed by CHA, Preston—taking illegal and immoral advantage of her position as Leased Housing Coordinator and her position of authority over CHA tenants—made undocumented purchases of firearms from CHA tenants at prices far below market value, on at least two occasions.

72.    These purchases demonstrate the gross dishonesty and blatant hypocrisy of these Defendants, who impose an unconstitutional Firearms Ban on CHA tenants while capitalizing on the Ban to acquire their firearms.

73.    In her deposition, Preston testified that in 2015, a tenant "called her up" on her office phone and informed Preston that she possessed a firearm in violation of the Firearms Ban. Preston further testified that the tenant was an elderly woman who was living alone as a tenant of CHA. After asking what the tenant wanted to do with the firearm, Preston offered to purchase the weapon. Less than one day later, Preston paid the tenant $50.00 for the firearm, which she described as a rifle.

74.     The fair market value of the tenant's rifle was well over $50.00. Had Preston purchased a rifle from a firearms retailer, she would have paid well over $50.00 for any firearm, regardless of the manufacturer, type, or condition of the firearm.

75.     That same day, the tenant delivered the firearm to Preston when she "brought the rifle out wrapped in a blanket or towel that night and put it in the trunk of [Preston's] car in the parking lot." After the tenant delivered her firearm to Preston, Preston immediately left CHA property and took the firearm to her home. Preston then gifted the firearm to her then-husband, who still has possession of the firearm.

76.     Preston testified that this, her first purchase of a tenant firearm, was conducted with the approval of the Director of Housing at the time, Margaret Lann. Preston contacted Lann after speaking with the tenant and offering to purchase her firearm, and Lann expressed no opposition to the corrupt transaction.

77.     Lann should have recognized that Preston was using her position of authority as Leased Housing Coordinator of CHA, and her insider knowledge, to exploit vulnerable tenants of CHA and purchase their firearms at below market rates. Indeed, at her deposition, Preston confirmed that she "became aware of the opportunity to purchase a rifle from an elderly woman solely because of [her] position as housing coordinator of CHA," and also that she "never would have become aware of the opportunity if [she] were not CHA housing coordinator."

78.     Several months after Preston's first purchase of a tenant firearm, Preston purchased another firearm from a different tenant of CHA. This tenant, identified by Preston as "Jean" (last name unknown), contacted Preston via her office phone and informed her that she was in possession of a firearm that violated the Firearms Ban.

79.     Jean, a CHA tenant in her seventies, was living at the Marathon Apartments when

19

she informed Preston that she possessed a firearm. Within hours of Jean contacting Preston, Preston purchased a .22 caliber rifle from Jean for around $50.

80.     The fair market value of Jean's rifle was well over $50. Had Preston purchased a similar firearm from a retailer or other individual seller, she would have paid well over $50 for any firearm, regardless of manufacturer, type, or condition.

81.     After visiting Jean's apartment and procuring the firearm from her residence, Preston took the firearm home and again gifted it to her then-husband.

82.     With respect to both of these corrupt transactions, Preston did not complete or file any paperwork, including a background check as required under New York General Business Law § 898, in connection with her purchase of firearms from CHA tenants. New York Gen. Bus. L. § 898 (6) defines this conduct as a Class A misdemeanor, punishable in accordance with the penal law.

83.     Moreover, around the outset of Merrin's tenancy with CHA, on at least one occasion, Preston approached Merrin's front door, and upon his answering her knock, observed one or more firearms in the residence. Preston informed Merrin that possession of firearms violated the Firearms Ban, and offered to purchase Merrin's firearms for approximately $50 each.

84.     When Preston offered to purchase Merrin's firearms, Merrin declined Preston's offer and instead stored his firearms with a trusted third party who was not a tenant of CHA.

85.     Around the outset of Irwin's tenancy with CHA, on at least one occasion, Preston visited Irwin's apartment and offered to purchase one or more of his firearms for approximately $50 each.

86.     At the time of Preston's offers to purchase firearms from Merrin, Irwin, "Jean," and the other unnamed tenant who sold a firearm to Preston, it was virtually impossible to legitimately

purchase a firearm for $50. Preston leveraged her authority as an employee of CHA to pressure tenants into selling their firearms to her without completing the necessary paperwork and at severely discounted rates. After securing firearms from CHA tenants for a steep discount, Preston gifted the firearms to her husband.

### VII.    The Firearms Censorship

38.87.  Social media—including Facebook—has become a crucial venue for governmental agencies and officials to disseminate news and information, and an equally crucial venue for the public to express their thoughts and opinions in response to such news and information, to criticize or object to governmental agencies and officials, to criticize or object to governmental laws and policies, and to seek redress of grievances with agencies and officials. As the Supreme Court has observed, social media platforms provide "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). These platforms are at the leading edge of a technological "revolution" due to their ability to increase civic engagement with agencies and officials through rapid and direct communication opportunities. *Id*. at 105-06. Social media now serves as a more convenient conduit for acts of speech and petition than physical gatherings, such as town hall meetings, because online platforms enable an individual "to become a town crier with a voice that resonates farther than it could from any soapbox." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 870 (1997).

39.88.  Facebook is a social media platform with approximately 2,000,000,000 monthly users worldwide, including well over 200,000,000 users in the United States and Canada. The platform allows users to post messages and photos, to respond to or share others' messages or photos, and to interact with other Facebook users in relation to those posts.

40.89.  Users have the ability to ban, or block, others from access to their page, or to delete

21

posts made by other users on that page. When a user is banned from a page, they lose their ability to publish to that page, react to posts on that page, or comment on the posts on that page.

41.90.  Defendants maintain and control the CHA Facebook Page, which is a significant source of news and information for CHA tenants, as well as a popular forum for speech and petition by, to, and about Defendants.

42.91.  The CHA Facebook Page is a public forum under the First Amendment. The Page is accessible to the public generally and in particular to CHA tenants; it is accessible to all Facebook users.

43.92.  On February 15, 2023, Hunter, concerned about the Firearms Ban, decided to voice his concerns on the CHA Facebook Page.

44.93.  On, prior to, and since February 15, 2023, Defendants permitted members of the public, including CHA tenants, to post comments in response to forums or subtopics created by Defendants within the CHA Facebook Page.

45.94.  Since this was Hunter's first time using the CHA Facebook Page and there was no readily apparent specific forum or subtopic within the Page for tenants to comment on Defendants' policies relating to firearms or otherwise, he understandably decided to voice his concerns by posting a comment in response to the first subtopic that he saw—a February 2, 2023 CHA post commemorating Groundhog Day.

46.95.  Hunter's comment was brief and civil; he merely desired to voice his viewpoint that the Firearms Ban was unconstitutional.

47.96.  Hunter's comment, in sum and substance, was that CHA tenants should be allowed to have firearms in their private dwellings as long as they are law-abiding citizens, that the lease provision (the Firearms Ban) is unconstitutional, and that the *N. Doe* case supports his argument.

48.97.  That same day, Defendants deleted Hunter's comment and banned him from access to the CHA Facebook Page because he expressed his viewpoint about Defendants' violation of the Constitution. Because Defendants deleted Hunter's comment and took away his access so quickly, he was not able to retain a screenshot of the comment.

49.98.  Hunter remains banned from access to the CHA Facebook page as of the present time.

50.99.  Although censored by Defendants, on April 10, 2023, Hunter wrote an email to CHA complaining about the Firearms Ban, writing:

> First up tenants are allowed to have firearms in their private dwelking [sic], as long as the [sic] are law abiding citizens. At the time of writing this and prior to writing this, what your lease states is unconstitutional. If it isn't removed, I will have no other choice but to take legal action against the housing authority. I've spoke too [sic] and am ready to move forward with a lawsuit if the policy is not changed. I also research HUDs position, federal and state laws, I can't find one that allows for a firearm ban, making your firearm covenant unconstitutional and discriminatory against poor people. N DOE V East St Louis Housing authority court decision decided it was an unconstitutional provision in the lease, no different than the lease you made every tenant here sign. The lease you had me and every other tenant sign was from 2008, and not the updated guidelines of 2020, which believe it or not say nothing about firearms. This is a strict violation of the constitution and it has been proven in courts over and over and I am not sure why Cortland housing authority funds [sic] it ok to ignite the constitution, or discriminate based upon a person being poor.
>
> I will also file a full grievance regarding the issue, I will also be looking at litigation as ignorance of law is not a defense. The ignorance of the housing authority is discrimination, blatant discrimination.

51.100. On May 1, 2023, CHA's attorney emailed Hunter's attorney and advised regarding the Firearms Ban: "Unconstitutional lease provision regarding firearms. We will not be changing our stated position or lease provision on this matter."

52.101. Also, at an in-person tenant meeting with Diiorio about various issues on June 30, 2023, Hunter again complained that the Firearms Ban was unconstitutional but was told CHA would not change its firearms policies.

53.102.Hunter's social media comment, email, and meeting complaint unequivocally demonstrate that Defendants were on notice that the Firearms Ban was (and still is) unconstitutional long before Plaintiffs commenced this action, yet arrogantly took no steps to remedy this violation of the Constitution and to bring the RLA into compliance with the Supreme Court's commands.

54.103.Defendants' reactions to Hunter's social media comment and email are also telling; by deleting his comment, banning him from access to the CHA Facebook Page, and then informing him that that CHA would not be changing its firearms policy, CHA's leadership, from the top down, betrayed their rogue attitude that CHA is above the law and that CHA's leadership is free to run the agency like a sealed-off hermit kingdom without any regard for the Constitution.

**VIII.   Retaliation**

104.    The First Amendment to the Constitution protects the rights of individuals to express themselves freely and to petition the government for redress of grievances. These are fundamental rights that form the bedrock of American society. But, as set forth below, Defendants retaliated against Hunter for petitioning them to address the brazen violations of constitutional rights committed by CHA.

105.    Section VIII of the RLA details "CHA Obligations," and states that CHA is obligated to "keep project building, facilities, and common areas, not otherwise assigned to Tenant for maintenance and upkeep, in a clean and safe condition; [966.4(e)(4)]." (citation in original).

106.    CHA's Galatia Apartments houses elderly and/or disabled tenants.

107.    Despite CHA's obligation to maintain the common areas of its facilities in "clean and safe condition," **Ex. A.**, CHA has engaged in a pattern and practice of neglecting to make necessary repairs on its property, including fixing handrails, removing snow from hazardous

24

sidewalks, and installing working lightbulbs in the lamps that illuminate its outdoor spaces.

108.    As of April 30, 2023, the handrail on a set of outdoor stairs located in a common area at the Galatia Apartments was unstable and could not be used for support when passing up and down stairs.

109.    A wobbly handrail on a set of outdoor stairs poses a safety concern for any population, but is especially dangerous for those individuals who are elderly and/or disabled and may have trouble navigating stairs without a working handrail, such as the residents the Galatia Apartments.

110.    On April 30, 2024, Hunter initiated a conversation with Robert Thayer, the maintenance foreman of CHA who was conducting maintenance on the common area outside of Hunter's apartment ("Thayer").

111.    Hunter made a comment about the speed at which repairs were being completed at the property, which evolved into a discussion of the details of the repair work that was being completed by Thayer.

112.    After Hunter and Thayer spoke for a few minutes, Hunter continued to walk towards his apartment. Thayer followed Hunter, asking Hunter if he "had a fucking problem with" Thayer. Hunter calmly responded to Thayer's attempt to incite conflict, stating that he did not have a problem with Thayer and expressing his frustration with the speed at which necessary repairs were being completed by CHA.

113.    Following Thayer's aggressive comment, he made another comment calling the tenants of CHA who were challenging the Firearms Ban "idiots" and expressing his disapproval of "these idiots having guns in their houses." Again, Hunter calmly informed Thayer that he was "one of those idiots" challenging the Firearms Ban. Thayer and Hunter conversed for several more

minutes, ultimately shaking hands at the end of this bizarre interaction.

114.    On May 9, 2024, Hunter received a letter (the "Retaliatory Letter") from Wasley informing him that he was "in violation of [his] lease section IX. Tenant's Obligations" for "acting in an aggressive manner while [maintenance staff] were trying to work on the property." A true and accurate copy of the letter is attached hereto as **Exhibit B.**

115.    At no point on April 30, 2023 did Hunter raise his voice, nor did he use any profanity directed at Thayer. Other than a handshake, at no point did Hunter and Thayer make any physical contact. Hunter did not threaten or speak in an abusive manner to Thayer.

116.    The allegations in the Retaliatory Letter are entirely false. Contrary to such allegations, Thayer was the aggressor on April 30, 2023. Hunter expertly de-escalated the conflict and maintained a calm demeanor at all times during his interactions with Thayer.

117.    The Retaliatory Letter alleges false facts against Hunter. Wasley, acting under direction from Diiorio, wrote, signed, and sent the Retaliatory Letter as part of an attempt to evict Hunter from CHA.

118.    The temporal proximity between this litigation and the Retaliatory Letter are highly probative of the fact that Wasley and Diiorio sent the Retaliatory Letter to punish Hunter for his commentary on violations of constitutional rights by CHA, and for being the lead Plaintiff in this action.

119.    Wasley and Diiorio sent the Retaliatory Letter because they perceived Hunter's repeated complaints about the Firearms Ban and the violations of his constitutional rights imposed by CHA to be disruptive and contrary to CHA's interests—those interests being suppression of constitutional rights.

120.    Wasley and Diiorio sent the Retaliatory Letter because they wanted to silence

Hunter's speech on violations of his rights protected by the First Amendment and the Second Amendment.

121.   Wasley and Diiorio also sent the Retaliatory Letter in an attempt to evict Hunter from CHA for the purpose of compromising his standing to bring a claim in this litigation.

**CLAIMS FOR RELIEF**

~~55.~~122. As to all claims for relief set forth below, Plaintiffs repeat, reallege, and incorporate by reference each and every allegation of the foregoing paragraphs as if fully set forth in each claim for relief.

123.   As to all claims for relief set forth below, Defendants were, at all times relevant to this action, state actors for purposes of 42 U.S.C. § 1983.

124.   As to all claims for relief set forth below, the Individual Plaintiffs are citizens of the United States who have fundamental rights that are protected pursuant to 42 U.S.C. § 1983 and the United States Constitution.

**COUNT ONE**
**Violation of the United States Constitution**
**Second & Fourteenth Amendments**
**(42 U.S.C. § 1983)**
**As-Applied to the Individual Plaintiffs and Facial**
**The Firearms Ban**
**(All Plaintiffs v. ~~All~~ Defendants CHA, Diiorio, and Preston)**

~~56.~~125. The Second Amendment to the Constitution provides:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. CONST. amend. II.

~~57.~~126. Incorporated against the states through the Due Process Clause of the Fourteenth

Amendment, *McDonald*, 561 U.S. 742, the Second Amendment guarantees "an individual right to keep and bear arms," *Heller*, 554 U.S. at 595. It is "a fundamental constitutional right guaranteed to the people," *id*., which is and has always been key to "our scheme of ordered liberty." *McDonald*, 561 U.S. at 767-68.

58.127. Here, as a threshold matter, CHA is unquestionably a governmental entity and Diiorio is unquestionably a governmental actor, both subject to the Second Amendment. They concede as much, agreeing that the RLAs executed by the Individual Plaintiffs, and thus, the Firearms Ban itself, are "within the scope of the Second Amendment and presumptively protected conduct of owning a firearm for self-defense in one's hearth and home." (*See* Defendants' Memorandum of Law in Support of Motion to Dismiss Plaintiff Second Amendment Foundation's Complaint and in Opposition to Plaintiffs' Application for Injunctive Relief, ECF 17-8 at 16) (emphasis added).

59.128. Therefore, since Defendants are subject to the Second Amendment, the only other question is whether the Firearms Ban violates the Second Amendment. Applying the historical and textual test that *Heller* and *Bruen* require, the answer to this question is undoubtedly yes, the Ban blatantly violates the Second Amendment.

60.129. "*Heller* . . . demands a test rooted in the Second Amendment's text, as informed by history." *Bruen*, 597 U.S. at 19 (citing *Heller*, 554 U.S. 570). Consistent with this demand, and because "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms," *Heller*, 554 U.S. at 582, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19.

61.130. Here, CHA's tenants, including the Individual Plaintiffs, are completely barred

28

from exercising their fundamental right to keep and bear arms in their "*home*, where the need for defense of self, family, and property is *most acute*." *Heller*, 554 U.S. at 628 (emphasis added).

62.131. A governmental entity simply may not impose a wholesale ban on the possession of firearms, including handguns, in the home. *Heller*, 554 U.S. at 576 (holding that the District of Columbia's "total ban on handguns, as well as its requirement that firearms in the *home* be kept nonfunctional even when necessary for self-defense" violated the Second Amendment) (emphasis added); *id*. at 627 ("As we have said, the law totally bans handgun possession in the *home*.") (emphasis added).

63.132. Indeed, the Second Amendment "takes certain policy choices off the table [including] the absolute prohibition of *handguns* held and used for self-defense in the home." *Heller*, 554 U.S. at 636. (Emphasis added). As Defendants should know, "the American people have considered the handgun to be the quintessential self-defense weapon" and "handguns are the most popular weapon chosen by Americans for self-defense in the home" *Id*. at 629.

64.133. New York State can't ban possession of handguns and other firearms in the home and neither can Defendants.

65.134. When it comes to the home, banning firearms generally is a policy choice that is "off the table," and banning handguns in particular is also "off the table."

66.135. It is beyond cavil that there is *no* historical tradition of banning possession of firearms, including handguns, in American homes. Therefore, CHA cannot make an affirmative showing that the Firearms Ban is part of any historical tradition of firearms regulation.

67.136. Moreover, because "the Second Amendment extends, prima facie, *to all instruments that constitute bearable arms*," *Heller*, 554 U.S. at 582, the Firearms Ban is unconstitutional both because it bans the possession of firearms *and* because it bans the possession

29

of other legal non-firearm weapons, such as knives. The Individual Plaintiffs have a fundamental right not only to possess firearms in their homes at the Galatia Apartments, but also to possess non-firearm weapons for self-defense and other lawful purposes.

68.137. The Firearms Ban is a *wholesale* ban on firearms possession *and ownership*, including handguns, since CHA's tenants, including the Individual Plaintiffs, are uniformly individuals of extremely limited economic means and have no other homes or residences at which to maintain or store firearms including handguns. There can be no firearms ownership without firearms possession, and since the Ban precludes possession of handguns and other firearms, it also cuts off the fundamental right to *ownership* of handguns and other firearms.

69.138. The Firearms Ban also deprives the Individual Plaintiffs and all other CHA tenants from exercising their fundamental right to armed self-defense in the home, since there can be no armed self-defense in the home without lawfully-possessed handguns or other firearms, or non-firearm weapons.

70.139. The Firearms Ban lacks any constitutional, statutory, or regulatory basis. The Ban is nothing more than Defendants' ideological policy preference.

71.140. Defendants have adopted and maintained the Firearms Ban acting under color of state law. Therefore, intentionally and acting under color of state law, Defendants have deprived and continue to deprive the Individual Plaintiffs and all other tenants at CHA properties of their fundamental constitutional right to keep and bear arms in their homes, entirely inconsistent with any historic tradition of firearms regulation, and Plaintiffs have consequently been damaged and will be irreparably harmed each day that the Firearms Ban is allowed to stand.

72.141. The Firearms Ban inflicts irreparable harm on the Individual Plaintiffs, all other CHA tenants, SAF and its other members affected by the Ban, and all other individuals who would

possess and own firearms and non-firearm weapons in their homes at CHA properties, but for the Ban. Plaintiffs have a substantial likelihood of success on the merits of their claims under the Second and Fourteenth Amendments, lack an adequate remedy at law for this infringement on their fundamental right to keep and bear arms, and the harm that Plaintiffs would suffer from denial of an injunction exceeds any legally cognizable harm an injunction may inflict upon Defendants. The public interest favors enjoining enforcement of the Firearms Ban.

73.142. As a direct and proximate result of the above violation of Plaintiffs' rights protected under the Second and Fourteenth Amendments, the Individual Plaintiffs, SAF and its other members, and all other similarly situated individuals, have suffered an unlawful deprivation of their fundamental constitutional right to keep and bear arms, and they will continue to suffer such an injury until granted the relief sought herein.

74.143. Accordingly, Plaintiffs, having already been awarded the Preliminary Injunction, are entitled to further injunctive relief in the form of a temporary restraining order, preliminary injunction, and ultimately a permanent injunction, enjoining Defendants from enforcing the Firearms Ban and requiring Defendants to strike the Firearms Ban from the CHA RLA in order to protect against the irreparable harm of ongoing deprivation of Second and Fourteenth Amendment rights.

75.144. Plaintiffs are also entitled to a declaration that the Firearms Ban violates the Second and Fourteenth Amendment rights of the Individual Plaintiffs, SAF and its other members, and all other CHA tenants; and further, that the Firearms Ban is unconstitutional as applied to the Individual Plaintiffs and on its face.

76.145. In addition to injunctive and declaratory relief, Plaintiffs are entitled to compensatory (or nominal) and punitive damages for Defendants' violation of their clearly

established rights under the Second and Fourteenth Amendments.

77.146.As well, Plaintiffs are entitled to their attorneys' fees and costs associated with this action.

**COUNT TWO**
**Violation of the United States Constitution**
**First & Fourteenth Amendments**
**(42 U.S.C. § 1983)**
**Free Expression**
**The Firearms Censorship**
**(Plaintiff Hunter v. All Defendants CHA and Diiorio)**

78.147.The First Amendment to the Constitution, incorporated through the Fourteenth Amendment, provides in pertinent part:

> Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances.

U.S. CONST. amend. I.

148.    At its core, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95, (1972).

79.149.Here, when Hunter posted a comment on the CHA Facebook Page expressing his disagreement with the Firearms Ban and criticism of Defendants, Defendants promptly deleted his message because they disapproved of Hunter's viewpoint and sought to silence him—the Firearms Censorship; and, the Censorship continued when Defendants banned him from access to the CHA Facebook Page, again because of their disapproval of his viewpoint and desire to silence him. Hunter remains banned from the CHA Facebook Page at the present time.

80.150.The Firearms Censorship violates Hunter's right to freedom of expression under the First and Fourteenth Amendments because it imposes a viewpoint-based restriction on his

participation in a public forum.

81.151.Defendants caused and maintained the Firearms Censorship acting under color of state law. Therefore, intentionally and acting under color of state law, Defendants have deprived and continue to deprive Hunter of his fundamental constitutional right to freedom of expression, and Hunter has consequently been damaged and will be irreparably harmed each day that the Censorship is allowed to stand.

82.152.Accordingly, Hunter is entitled to a permanent injunction requiring Defendants to cease their unconstitutional practice of censoring Hunter's comments on CHA's Facebook page—the Firearms Censorship—and to restore his messages, to restore his full posting privileges, and to refrain from unlawfully censoring CHA tenants' messages on the basis of viewpoint.

83.153.Hunter is also entitled to a declaration that Defendants' viewpoint-based censorship of Hunter from CHA's official Facebook page—the Firearms Censorship—is unconstitutional.

84.154.In addition to injunctive and declaratory relief, Hunter is entitled to compensatory (or nominal) and punitive damages for Defendants' violation of his clearly established rights under the First and Fourteenth Amendments.

85.155.As well, Plaintiffs are entitled to their attorneys' fees and costs associated with this action.

**COUNT THREE**
**Violation of the United States Constitution**
**First & Fourteenth Amendments**
**(42 U.S.C. § 1983)**
**Right to Petition**
**The Firearms Censorship**
**(Plaintiff Hunter v. All Defendants CHA and Diiorio)**

86.156.The First Amendment to the Constitution, incorporated through the Fourteenth Amendment, provides in pertinent part:

> Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances.

> U.S. CONST. amend. I.

87.157. Here, when Hunter posted a comment on the CHA Facebook Page expressing his disagreement with the Firearms Ban, Defendants promptly deleted his message because they disapproved of Hunter's viewpoint and sought to silence him—the Firearms Censorship; and, the Censorship continued when Defendants banned him from access to the Page, again because of their disapproval of his viewpoint and desire to silence him. Hunter remains banned from the Page at the present time.

88.158. The Firearms Censorship violates Hunter's right to petition for redress of grievances under the First and Fourteenth Amendments because it imposes a viewpoint-based restriction on his participation in a public forum and nullified his ability to petition.

89.159. Defendants caused and maintained the Firearms Censorship acting under color of state law. Therefore, intentionally and acting under color of state law, Defendants have deprived and continue to deprive Hunter of his fundamental constitutional right to petition for redress of grievances, and Hunter has consequently been damaged and will be irreparably harmed each day that the Censorship is allowed to stand.

90.160. Accordingly, Hunter is entitled to a permanent injunction requiring Defendants to cease their unconstitutional practice of censoring Hunter's comments on CHA's Facebook page— the Firearms Censorship—and to restore his messages, to restore his full posting privileges, and to refrain from unlawfully censoring CHA tenants' messages on the basis of viewpoint.

91.161. Hunter is also entitled to a declaration that Defendants' viewpoint-based censorship of Hunter from CHA's official Facebook page—the Firearms Censorship—is unconstitutional.

34

92.162.In addition to injunctive and declaratory relief, Hunter is entitled to compensatory (or nominal) and punitive damages for Defendants' violation of his clearly established rights under the First and Fourteenth Amendments.

93.163.As well, Plaintiffs are entitled to their attorneys' fees and costs associated with this action.

**COUNT FOUR**
**Violation of the United States Constitution**
**First & Fourteenth Amendments**
**(42 U.S.C. § 1983)**
**Retaliation**
**The Retaliatory Letter**
**(Plaintiff Hunter v. Defendants CHA, Diiorio, and Wasley)**

164.    The First Amendment to the Constitution, incorporated through the Fourteenth Amendment, provides in pertinent part:

> Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances.

> U.S. CONST. amend. I.

165.    To state a First Amendment retaliation claim, a plaintiff must allege that:

> "(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).

166.    Hunter engaged in a protected First Amendment activity on February 15, 2023 when he posted a comment to CHA's Facebook page criticizing the Firearms Ban expressing his view that it contradicts the protections guaranteed by the Second Amendment.

167.    As set forth in more detail *supra*, Hunter engaged in protected First Amendment

conduct when on April 10, 2023, Hunter wrote an email to CHA complaining about the Firearms Ban.

168.   Hunter further engaged in activity protected by the First Amendment when he publicly complained about the Firearms Ban at the tenant meeting held by CHA on June 30, 2023.

169.   After CHA repeatedly and arrogantly informed Hunter that it would not be changing its policies, regardless of their violation of rights guaranteed by the Second Amendment, Hunter engaged in activity protected by the First Amendment by bringing this action in December 2023.

170.   Hunter's conduct in protest of the Firearms Ban, including the social media comment, the email exchange with CHA, the tenant meeting statement, and bringing this action, were all steps taken in order to "petition the government for the redress of grievances," which is the very heart of protections afforded by the First Amendment.

171.   On April 30, 2023, Hunter initiated a conversation with Thayer (detailed *supra*) by asking for information on the reasons for delaying repairs to common areas maintained by CHA. After Hunter and Thayer spoke for a few minutes, Hunter continued to walk towards his apartment. The employee followed Hunter, asking Hunter if he "had a fucking problem with" the employee. Hunter calmly responded to the employee, and the two conversed for several more minutes, ultimately shaking hands at the end of their interaction.

172.   Yet, despite engaging in no wrongdoing, on May 9, 2024, Hunter received a letter from Wasley at Diiorio's behest (the Retaliatory Letter), informing him that he was "in violation of [his] lease section IX. Tenant's Obligations" for "acting in an aggressive manner while [maintenance staff] were trying to work on the property." **Ex. B.**

173.   Wasley and Diiorio, acting intentionally and under color of law, took an action that

36

adversely affected Hunter's First Amendment rights when Wasley (under Diiorio's direction) authored, signed, and sent the Retaliatatory Letter to Hunter on May 9, 2024, an action that was likely to "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir. 2001) (overruled on other grounds).

174.  There was a causal relationship between Hunter's protected activity and Wasley's conduct. But for Hunter's involvement with this litigation and his protest of the Firearms Ban via in-person, email, and social media petitions for a change in the policy, Wasley would not have sent the Retaliatory Letter.

175.  On information and belief, Wasley was directed to send the Retaliatory Letter by Diiorio.

176.  The Retaliatory Letter was sent in an attempt to take steps to evict Hunter in retaliation for his resistance to CHA's violations of the Second Amendment rights of its tenants, including the Individual Plaintiffs.

177.  The Retaliatory Letter was sent in an attempt to evict Hunter from CHA, which could impact his standing as a plaintiff in this ongoing litigation.

178.  Defendants drafted and sent the Retaliatory Letter acting under color of state law. Therefore, intentionally and acting under color of state law, Defendants have retaliated against Hunter for his protected speech, and Hunter has consequently been damaged and will be irreparably harmed each day that CHA's practice of falsifying lease violations against dissenters is allowed to continue.

179.  Hunter has suffered damages in facing potential eviction from his government-funded apartment. Hunter has also suffered humiliation, emotional distress, mental anguish and

damage to his personal reputation and good name, as well as financial damages and damage to his future ability to obtain housing and housing prospects and his ability to be approved for housing. Accordingly, Hunter is entitled to a permanent injunction requiring Defendants to cease their unconstitutional practice of retaliating against Hunter for his speech, and to revoke the Retaliatory Letter, to remove any record of the conduct alleged in the Retaliatory Letter from Hunter's resident file, and to refrain from unlawfully retaliating against CHA tenants who choose to speak out on CHA's violations of its tenants' rights.

180.    Hunter is also entitled to a declaration that Defendants' retaliation against Hunter for expressing his views on CHA's conduct is unconstitutional.

181.    As well, Plaintiffs are entitled to their attorneys' fees and costs associated with this action.

**COUNT FIVE**

**Violation of the United States Constitution**
**First Amendment**
**(42 U.S.C. § 1983)**
**Right to Petition**
**The Retaliatory Letter**
**(Plaintiff Hunter v. Defendants CHA, Diiorio, and Wasley)**

182.   The First Amendment to the Constitution, incorporated through the Fourteenth Amendment, provides in pertinent part:

> Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances.

> U.S. CONST. amend. I.

183.    Here, when Hunter engaged in protected First Amendment speech, including by bringing this action and by informing a CHA employee that he was one of the individuals bringing

38

this action, Defendants CHA, Diiorio, and Wasley promptly cited Hunter for a falsified violation of his lease because they disapproved of Hunter's viewpoint and sought to evict him from his home—the Retaliatory Letter.

184.    Hunter, as a concerned and impacted resident of CHA, has repeatedly petitioned Defendants for redress of grievances—he has spoken out at tenant meetings, in email, and in Court filings on matters of public concern in the CHA community, including and especially the Firearms Ban.

185.    The Retaliatory Letter violates Hunter's right to petition for redress of grievances under the First and Fourteenth Amendments because it was intended to impede Hunter's ability to petition the government for a redress of grievances, including by terminating Hunter's CHA tenancy.

186.    But for Hunter's involvement in this litigation, Defendants would not have drafted or sent the Retaliatory Letter.

187.    The Retaliatory Letter threatens Hunter's status as a tenant of CHA, which in turn threatens his ability to seek remedy from CHA for violation of his rights, including by participating in tenant meetings, bringing and participating in this action, and voicing his concerns on social media as a tenant. Thus, the Retaliatory Letter imposes a viewpoint-based restriction on Hunter's participation in a public forum and nullifies his ability to petition CHA.

188.    Accordingly, Hunter is entitled to a permanent injunction requiring Defendants to cease their unconstitutional practice of threatening the tenancy of those who speak out against CHA's deprivation of the rights of its tenants.

189.    Hunter is also entitled to a declaration that Defendants' Retaliatory Letter threatening his tenancy following a conversation about this action is unconstitutional.

190.    In addition to injunctive and declaratory relief, Hunter is entitled to compensatory (or nominal) and punitive damages for Defendants' violation of his clearly established rights under the First and Fourteenth Amendments.

191.    As well, Plaintiffs are entitled to their attorneys' fees and costs associated with this action.

**COUNT SIX**

**Violation of the United States Constitution**
**First Amendment**
**(42 U.S.C. § 1983)**
**Free Expression**
**The Retaliatory Letter**
**(Plaintiff Hunter v. Defendants CHA, Diiorio, and Wasley)**

192.    The First Amendment to the Constitution, incorporated through the Fourteenth Amendment, provides in pertinent part:

Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances.

U.S. CONST. amend. I.

193.    At its core, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95, (1972).

194.    Here, when Hunter made a statement to a CHA employee identifying himself as one of the individuals bringing this action against CHA, Defendants promptly sent Hunter the Retaliatory Letter , alleging that he was in violation of his lease for "aggressive" speech directed at a CHA employee.

195.    The Retaliatory Letter falsely accused Hunter of speaking or acting in an aggressive

manner towards a member of CHA's staff. Contrary to the minimal facts asserted in the Retaliatory Letter, Hunter did not act aggressively towards a member of CHA staff. Rather, on the date in question, a member of CHA staff was aggressive towards Hunter. Hunter was the de-escalating party in the circumstances.

196.    Alternatively, CHA attempted to "bait" Hunter into a confrontation with CHA staff in order to cite him for violation of his lease and evict him from his CHA housing unit.

197.    CHA's actions violate Hunter's right to freedom of expression under the First and Fourteenth Amendments because they impose a viewpoint-based restriction on his ability to speak in a public forum, including by discussing this litigation.

198.    Defendants drafted and sent the Retaliatory Letter acting under color of state law. Therefore, intentionally and acting under color of state law, Defendants have deprived and continue to deprive Hunter of his fundamental constitutional right to freedom of expression, and Hunter has consequently been damaged and will be irreparably harmed each day that Defendants are allowed to continue to try to evict tenants that speak out against their policies.

199.    Accordingly, Hunter is entitled to a permanent injunction requiring Defendants to cease their unconstitutional practice of issuing notices of lease violations to tenants that speak out against CHA policies and to remove the violation described in the Retaliatory Letter from Hunter's file and to refrain from unlawfully censoring CHA tenants on the basis of viewpoint.

200.    Hunter is also entitled to a declaration that Defendants' Retaliatory Letter to Huunter- written and sent after Hunter repeatedly raised his concerns about CHA's policies, is unconstitutional.

201.    In addition to injunctive and declaratory relief, Hunter is entitled to compensatory (or nominal) and punitive damages for Defendants' violation of his clearly established rights under

the First and Fourteenth Amendments.

202.    As well, Plaintiffs are entitled to their attorneys' fees and costs associated with this action.

**COUNT SEVEN**
**Violation of the Due Process Clause of the Fourteenth Amendment**
**(42 U.S.C. § 1983)**
**The Cooperation Requirement**
**(Plaintiff Hunter v. Defendants CHA, Diiorio, and Wasley)**

203.    Plaintiff Hunter is a tenant of CHA who is subject to the provisions of the RLA.

204.    Under the Due Process Clause of the Fourteenth Amendment, "[n]o state shall make or enforce any law which shall . . . deprive any person of life, liberty, or property, without due process of law." "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "Even when speech is not at issue, the void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Television*, 567 U.S. 239, 254 (2012).

205.    It is well-settled that the prohibition of "abusive" language is overbroad. Indeed, the Supreme Court held in *Gooding v. Wilson* that a statute which read: "'(a)ny person who shall, without provocation, use to or of another, and in his presence . . . *opprobrious words or abusive language*, tending to cause a breach of the peace . . . shall be guilty of a misdemeanor,' which has not been narrowed by the Georgia courts to apply only to 'fighting' words 'which by their very utterance . . . tend to incite an immediate breach of the peace,' *is on its face unconstitutionally*

*vague and overbroad under the First and Fourteenth Amendments*." 405 U.S. 518, 518, (1972)

(citing *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942))(emphases added).

206.    The Supreme Court in *Gooding* explicitly stated that "[t]he dictionary definitions

of 'opprobrious' and 'abusive' give them greater reach than 'fighting' words." *Gooding v. Wilson*,

405 U.S. at 525.

207.    Section IX of the RLA states that CHA tenants are obligated (*inter alia*), to

> act in a cooperative manner with neighbors and CHA staff. To refrain from and
> cause members of Tenant's household or guests to refrain from acting or speaking
> in an **abusive or threatening** manner toward neighbors and CHA staff.

> Ex. A. (emphasis added), (the "Cooperation Requirement").

208.    Section IX of the RLA lacks any adequate definition of what constitutes "acting or

speaking in an abusive or threatening manner," thus precluding individuals from being able to

accurately and consistently determine whether their conduct is restricted by this clause. This allows

CHA to enforce the clause in an unconstitutionally arbitrary manner. Also, it fails to provide

specific notice of the criteria that CHA will apply to determine whether certain conduct rises to

the definition of "abusive or threatening" and is therefore a violation of the RLA.

209.    Thus, CHA's restriction on "abusive" speech or actions directed at CHA employees

leaves enormous room for interpretation by CHA such that "it leaves wide open the standard of

responsibility, so that it is easily susceptible to improper application." *Id*. at 528.

210.    The vagueness of CHA's "abusive language" restriction is demonstrated by the

contents of the Retaliatory Letter. As set forth *supra*, Hunter engaged in a conversation with an

employee of CHA that was deemed "aggressive" by individuals (Wasley and Diiorio) who were

not witness to the incident. Hunter received a letter indicating that he was in violation of his lease

for this conversation, even though he and Thayer shook hands at its conclusion. CHA's varying

enforcement of the "abusive language" restriction is demonstrative of the overbroad and unconstitutionally vague nature of this restriction.

211.    Defendants Wasley and Diiorio's official conduct as employees of CHA, in administering and enforcing the RLA and its restriction on "abusive or threatening" speech, have deprived Hunter and other CHA tenants of their rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, as described above.

212.    Hunter has suffered damages in facing potential eviction from his government-funded apartment.

213.    Hunter has also suffered humiliation, emotional distress, mental anguish and damage to his personal reputation and good name, as well as financial damages and damage to his future ability to obtain housing and housing prospects and his ability to be approved for housing.

214.    Accordingly, Hunter is entitled to a permanent injunction enjoining Defendants from enforcing the Cooperation Requirement, and requiring Defendants to strike the Cooperation Requirement from the CHA RLA in order to protect against the ongoing deprivation of the Individual Plaintiffs' Fourteenth Amendment equal protection rights.

215.    The Individual Plaintiffs are also entitled to a declaration that the Cooperation Requirement violates the Fourteenth Amendment equal protection rights of the Individual Plaintiffs.

216.    In addition to injunctive and declaratory relief, the Individual Plaintiffs are entitled to compensatory (or nominal) and punitive damages for Defendants' violation of their clearly established rights under the Fourteenth Amendment.

217.    As well, Plaintiffs are entitled to their attorneys' fees and costs associated with this action.

44

**COUNT EIGHT**
**Violation of the United States Constitution**
**Fourteenth Amendment**
**(42 U.S.C. § 1983)**
**Equal Protection–**
**(Individual Plaintiffs v. ~~All~~ Defendants CHA, Diiorio, and Preston)**

218.    The Fourteenth Amendment to the Constitution provides in pertinent part: "

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; not deny to any person within its jurisdiction the *equal protection of the laws*."

U.S. CONST. amend. XIV.

219.    "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).

220.    Here, Defendants' Firearms Ban, which denies lawful persons their individual rights of firearms ownership and possession as secured by the Second Amendment, due to their age, financial disadvantage, circumstances of residing in public housing, and disability, violates the Individual Plaintiffs' right to equal protection of the law, as secured by the Fourteenth Amendment.

221.    Accordingly, the Individual Plaintiffs are entitled to a permanent injunction enjoining Defendants from enforcing the Firearms Ban and requiring Defendants to strike the Firearms Ban from the CHA RLA in order to protect against the ongoing deprivation of the Individual Plaintiffs' Fourteenth Amendment equal protection rights.

222.    The Individual Plaintiffs are also entitled to a declaration that the Firearms Ban

45

violates the Fourteenth Amendment equal protection rights of the Individual Plaintiffs.

223.    In addition to injunctive and declaratory relief, the Individual Plaintiffs are entitled to compensatory (or nominal) and punitive damages for Defendants' violation of their clearly established rights under the Fourteenth Amendment.

~~100.~~224.        As well, Plaintiffs are entitled to their attorneys' fees and costs associated with this action.

## JURY DEMAND

~~101.~~Plaintiffs hereby demand trial by jury.

**WHEREFORE**, Plaintiffs demand judgment against the Defendants as follows:

~~(a)~~1.    On Count One, a ~~temporary restraining order, preliminary injunction, and ultimately a~~ permanent injunction~~,~~ enjoining Defendants from enforcing the Firearms Ban and requiring Defendants to strike the Firearms Ban from the CHA RLA in order to protect against the irreparable harm of ongoing deprivation of Second and Fourteenth Amendment rights; and

~~(b)~~2.    On Count One, a declaration that the Firearms Ban violates the Second and Fourteenth Amendment rights of the Individual Plaintiffs, SAF and its other members, and all other CHA tenants; and further, that the Firearms Ban is unconstitutional as applied to the Individual Plaintiffs and on its face; and

~~(c)~~3.    On Counts Two and Three, a permanent injunction requiring Defendants to cease their unconstitutional practice of censoring Hunter's comments on CHA's Facebook page—the Firearms Censorship—and to restore his messages, to restore his full posting privileges, and to refrain from unlawfully censoring CHA tenants' messages on the basis of viewpoint; and

~~(d)~~4.    On Counts Two and Three, a declaration that Defendants' viewpoint-based censorship of Hunter from CHA's official Facebook page—the Firearms Censorship—is

unconstitutional; and

5.        On Count FourOn Count Four, a declaration that the Retaliatory Letter violates

Hunter's First Amendment Rights; and

6.        On Count Four, an order that Defendants

7.        On Count Four, an award of punitive damages

8.        On Count Five, a declaration that the Retaliatory Letter violates Hunter's First

Amendment Rights; and

9.        On Count Six, a declaration that the Retaliatory Letter violates Hunter's First

Amendment Rights; and

10.       On Count Seven, a declaration that the Retaliatory Letter violates Hunter's First

Amendment Rights; and

(e)11.  On Count Eight, a permanent injunction enjoining Defendants from enforcing the

Firearms Ban and requiring Defendants to strike the Firearms Ban from the CHA RLA in order to

protect against the ongoing deprivation of the Individual Plaintiffs' Fourteenth Amendment equal

protection rights; and

(f)12.  On Count FourEight, a declaration that the Firearms Ban violates the Fourteenth

Amendment equal protection rights of the Individual Plaintiffs; and

(g)13.  On Counts One, Two, Three, Four, Five, Six, Seven, and FourEight, compensatory

(or nominal) and punitive damages in amounts to be determined upon trial of this action; and

(h)14.  On Counts One, Two, Three, Four, Five, Six, Seven, and FourEight, Plaintiffs'

attorneys' fees and costs associated with this action pursuant to 42 U.S.C. § 1988; and

(i)15.  Any other and further relief as the Court deems just and proper.  –

Dated: ~~January 11~~June 2, 2024
New York, NY

Respectfully submitted,

**BOCHNER PLLC**

By: /s/ *Edward Andrew Paltzik*
Edward Andrew Paltzik, Esq.
Serge Krimnus, Esq.
1040 Avenue of the Americas, 15th Floor
New York, NY 10018
(516) 526-0341
edward@bochner.law

*Attorneys for Plaintiffs*