# In the Matter of

Case No.: 5:23-cv-01540-GTS-ML

HUNTER, et al.

v.

CORTLAND HOUSING AUTHORITY, et al.

---

## Deposition of Carole Preston

*Wednesday, May 8, 2024*

---

The Little Reporting Company

469 Seventh Avenue
12th Floor
New York, NY 10018
tel: 646-650-5055
www.littlereporting.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
Case No.:  5:23-cv-01540-GTS-ML
----------------------------------------X

ROBERT HUNTER, ELMER IRWIN,
DOUG MERRIN, and THE SECOND
AMENDMENT FOUNDATION,

                         Plaintiffs,


CORTLAND HOUSING AUTHORITY and
ELLA M. DIIORIO, personally
and in her official capacity
as Executive Director of
CORTLAND HOUSING AUTHORITY,

                         Defendants.
----------------------------------------X



                    May 8, 2024
                    1:10 p.m.




     Examination of CAROLE PRESTON, held pursuant

  to Subpoena, held via Zoom conference, before

  Ruthayn Shalom, a shorthand Reporter and Notary

  Public within and for the State of New York.

HUNTER, et al. v. CORTLAND HOUSING AUTHORITY, et al.
Carole Preston  ---  May 8, 2024

2      A P P E A R A N C E S :

3              BOCHNER PLLC
               Attorneys for Plaintiffs
4              1040 Sixth Avenue, Suite 15B
               New York, New York 10018
5              BY: EDWARD PALTZIK, ESQ.
               edward@bochner.law

6

7              TOWNE LAW FIRM P.C.
               Attorneys for Defendants
8              500 New Kramer Road
               Albany, New York 12212
9              BY: MARK T. HOUSTON, ESQ.
               mark.houston@townelaw.com

10

11

       ALSO PRESENT:
12     Serge Krimnus, Esq., Bochner PLLC

13     Meredith Lloyd, Esq., Bochner PLLC

14

15

16

17

18

19

20

21

22

23

24

25

HUNTER, et al. v. CORTLAND HOUSING AUTHORITY, et al.
Carole Preston  ---  May 8, 2024

2       IT IS HEREBY STIPULATED AND AGREED, by

3    and between the attorneys for the respective

4    parties hereto, that this examination may be

5    sworn to before any Notary Public.

6

7       IT IS FURTHER STIPULATED AND AGREED that

8    the sealing and filing of the said examination

9    shall be waived.

10

11       IT IS FURTHER STIPULATED AND AGREED that

12    all objections to questions except as to form

13    shall be reserved for trial.

14

15

16

17

18

19

20

21

22

23

24

25

HUNTER, et al. v. CORTLAND HOUSING AUTHORITY, et al.
Carole Preston  ---  May 8, 2024

4

C. Preston

1
2          C A R O L E   P R E S T O N, having
3    been first duly sworn by Ruthayn Shalom, a Notary
4    Public of the State of New York, and stating her
5    address as ████████████████████████████████████
     ██████, was examined and testified as follows:
7    EXAMINATION BY
8    MR. PALTZIK:
9          Q    Good afternoon again, Ms. Preston.  How
10   are you today?
11         A    I'm fine.  How are you?
12         Q    I'm good.  Just a few ground rules before
13   we get started.  Please make sure you provide
14   complete answers that encompass all of your
15   knowledge on each question.  Feel free to pause and
16   take your time and don't speculate.
17         A    Okay.
18         Q    You're welcome to take a break.  If there
19   is a pending question, just try and answer the
20   question before we take a break.  Also just try and
21   make sure that in addition to providing truthful
22   answers, the court reporter can hear everything.
23   Also if you feel at any point you misspoke or made a
24   mistake, please feel free to point it out and
25   correct it later.

HUNTER, et al. v. CORTLAND HOUSING AUTHORITY, et al.
Carole Preston  ---  May 8, 2024

36

C. Preston

1

2          see what the objection can be.  Dangerous is a

3          common word.

4                MR. HOUSTON:  What are you referring to?

5                MR. PALTZIK:  Crime.

6                MR. HOUSTON:  Criminal danger?

7                MR. PALTZIK:  Yes, fine, fine.  That's

8          fair.  That's my fault.

9     BY MR. PALTZIK:

10         Q    I'm not talking about slipping on the ice

11    in January, I'm not talking about failing roof

12    shingles, I'm talking about crime.

13                   In your experience at CHA, was public

14    housing dangerous?

15         A    Sometimes.

16         Q    Can you elaborate, please?

17         A    Well, it would depend on specific tenants

18    and situations, I suppose.

19         Q    Can you talk about those situations?

20         A    Well, I don't know if I have anything

21    specific that comes to mind.  There would be

22    families that would fight amongst themselves and we

23    had elder abuse.  We had adult children that were

24    abusing their parents and attorneys had to step in

25    and get an order of protection, so yes, there were

HUNTER, et al. v. CORTLAND HOUSING AUTHORITY, et al.
Carole Preston  ---  May 8, 2024

37

                          C. Preston

1

2      situations that were dangerous.

3          Q     Did you ever observe any crimes at CHA

4      properties?

5          A     Such as?

6          Q     Not such as anything.  I'm asking for what

7      you observed, if anything.

8              MR. HOUSTON:  Objection to form.  I think

9          she's asking for, what do you mean by crime?

10     BY MR. PALTZIK:

11         Q     I'm asking if you ever personally observed

12     criminal activity at a CHA property.

13         A     I don't know if I personally observed it,

14     but I know of cases where we have had break-ins and

15     we had that sort of thing.

16         Q     How do you know of these cases?

17         A     Because I was the manager and I was privy

18     to lots of information.

19         Q     Okay.  How many different -- how many

20     separate incidents of criminal activity were brought

21     to your attention while you were employed at CHA?

22         A     I couldn't even venture to guess.  I was

23     there for almost 20 years.  We didn't have a ton.

24     There wasn't a ton of violence as far as -- that

25     would have been reported to us.  There may have been

HUNTER, et al. v. CORTLAND HOUSING AUTHORITY, et al.
Carole Preston  ---  May 8, 2024

38

C. Preston

1    things that happened where the police were called

2    and we weren't a part of it.  Does that make sense?

3         Q    Yes.  Everything you're saying makes

4    sense.

5              Let's try and estimate here.  As

6    manager at CHA -- and again, we are going to get to

7    that, but as the manager at CHA, it was part of your

8    job responsibilities to receive and assess reports

9    of criminal activities; is that fair?

10        A    No.  I don't think that's fair.

11        Q    Correct me, please.

12        A    So it could have been reported to the

13   director and then it was maybe given to me to --

14   maybe as simple as send the tenant a letter to

15   explain the lease violation or something like that.

16        Q    Did you ever receive a report of a

17   robbery?

18        A    Not a robbery, no.

19        Q    Did you ever receive a report of a murder?

20        A    No.

21        Q    Did you ever receive a report of a

22   burglary?

23        A    We had somebody that actually got into our

24   building and stole something from one of the

HUNTER, et al. v. CORTLAND HOUSING AUTHORITY, et al.
Carole Preston  ---  May 8, 2024

39

C. Preston

1          offices.

3          Q     What happened in that incident?

4          A     It was a man that was homeless and somehow

5    he managed to get into the building and -- while we

6    were at night, and was able to get into the office

7    and steal a lamp.

8          Q     He was arrested?

9          A     I don't know.  I don't remember.  I don't

10   recall.

11         Q     Did you ever see a report of an assault?

12         A     Family disputes but I don't know if I

13   would label it an assault.

14         Q     Well --

15         A     Because an assault to me would be, like,

16   somebody attacking somebody out on the street.

17         Q     No.  Assault includes domestic violence.

18         A     Then, yes.

19         Q     In your 20 years, did you ever receive

20   reports of domestic violence?

21         A     Yes.

22         Q     A lot?

23         A     No, not a lot.  I would say -- I don't

24   know.  Maybe half a dozen to a dozen cases.

25         Q     Over your entire time?

HUNTER, et al. v. CORTLAND HOUSING AUTHORITY, et al.
Carole Preston  ---  May 8, 2024

40

C. Preston

1

2      A    Yes, but it's hard to really estimate when
3      I have been out of it for a while.

4      Q    During your 20 years, did you ever receive
5      a report of an assault that occurred outside of the
6      home?

7      A    None come to mind.

8      Q    During your 20 years, did you ever receive
9      reports of theft?

10      A    Yes.

11      Q    How often?

12      A    Again, it would be maybe a dozen or so.

13      Q    Did you ever receive reports of violence
14      or violent activity or violent incidents?

15      A    Yes, and they were the domestic disputes.

16      Q    As part of your job as manager at CHA, did
17      you routinely interact and communicate with the
18      local police department?

19      A    Occasionally.

20      Q    What police department was that?

21      A    Cortland City Police.

22      Q    Do you believe that public housing tenants
23      should have the right to self-defense against crime
24      and violence on public housing property?

25      A    Yes, I believe that.

HUNTER, et al. v. CORTLAND HOUSING AUTHORITY, et al.
Carole Preston  ---  May 8, 2024

41

C. Preston

1

2      Q    What would be the nature of that

3    self-defense?  Do you believe they have the right to

4    defend themselves with their hands?

5      A    Yes.

6      Q    Do you believe they have the right to

7    defend themselves with a knife?

8      A    No.

9      Q    Do you believe they have the right to

10   defend themselves with a firearm?

11     A    No, because I haven't seen anything that

12   warrants that kind of defense.

13     Q    You're saying that at all of the CHA

14   housing properties, there was no violent activity

15   that would cause someone to need to defend

16   themselves?  You're saying in 20 years, nobody was

17   ever the subject of a violent incident?

18     A    No, I didn't say that.

19     Q    Well, you confined it to domestic

20   violence, so are you saying that in 20 years you

21   never saw -- you never heard of any violent

22   incidents outside of the home on CHA property where

23   somebody would need to defend themselves?

24     A    Can you ask that again?

25     Q    You're saying in 20 years there was never

HUNTER, et al. v. CORTLAND HOUSING AUTHORITY, et al.
Carole Preston  ---  May 8, 2024

42

C. Preston

1

2    a violence incident on CHA property that would

3    necessitate self-defense?

4        A    I don't know.  I would imagine there was

5    but not to the degree where they need a knife or a

6    gun.

7        Q    You did say there were a lot of

8    domestic-violence incidents, right?

9        A    Right, but usually they were handled and

10    then brought to any attention.

11        Q    Let's talk about -- we going to talk about

12    domestic violence.  I do want to ask you one thing

13    before I pivot to that.  Did you ever receive

14    reports of drug crimes?

15        A    Yes.

16        Q    A lot?

17        A    It was getting worse by the time I left.

18        Q    A lot, a little or in between?

19        A    In between.

20        Q    What kind of drugs?

21        A    A lot of marijuana, meth, and I really

22    don't know.  Needles, we would find a lot of

23    needles, that sort of thing.

24        Q    Possession of drugs, sale of drugs or

25    both?

HUNTER, et al. v. CORTLAND HOUSING AUTHORITY, et al.
Carole Preston  ---  May 8, 2024

43

C. Preston

1

2     A     Possession.

3     Q     Never sale?

4     A     Not that I know of.

5     Q     Let's go back to domestic violence.  Do

6     you believe that women are often the victims of

7     domestic violence?

8     A     Yes.

9     Q     Do you believe that women who are the

10    victims of domestic violence should be able to

11    engage in self-defense against their attackers?

12    A     Yes.

13    Q     Do you believe that women who are the

14    victims of domestic violence should be able to

15    defend themselves against attackers using their

16    hands?

17    A     Yes.

18    Q     Do you believe that women who are the

19    victims of domestic violence should be able to

20    defend themselves against their attacker using a

21    knife?

22    A     I don't know because it depends on what

23    happens to them.

24    Q     Okay.  Do you believe that the victim of a

25    domestic-violence incident whose life is in danger

HUNTER, et al. v. CORTLAND HOUSING AUTHORITY, et al.
Carole Preston  ---  May 8, 2024

45

                        C. Preston

1                       C. Preston

2      firearm?

3              MR. HOUSTON:  Objection to form.

4          Q     You can answer.

5          A     Of course I believe somebody should have

6      the right to defend themselves.

7          Q     In your 20 years at CHA, did you ever

8      receive any reports of rape or sexual assaults?

9          A     No.

10         Q     Certainly rape and sexual assault are not

11     allowed on CHA property, correct?

12             MR. HOUSTON:  Objection to form.

13         Q     The laws of New York State apply to CHA

14     property, correct?

15         A     Yes.

16         Q     So rape, sexual assault and domestic

17     violence are just as illegal on CHA properties as

18     anywhere else in New York State, correct?

19         A     Correct.

20         Q     Okay.  Well, a woman who is being raped in

21     their own home should be able to defend themselves,

22     correct?

23         A     Correct.

24         Q     And a woman who is being raped in her own

25     home should be able to defend herself with a knife,

HUNTER, et al. v. CORTLAND HOUSING AUTHORITY, et al.
Carole Preston  ---  May 8, 2024

52

C. Preston

1

2      Q    Why didn't you think about that?  Doesn't

3  that matter to you?

4           MR. HOUSTON:  Objection to form.

5      A    Of course it matters.  We live in a

6  relatively safe area, low crime rate.

7      Q    You just told me about crime at CHA

8  property.  It certainly wasn't crime-free, was it?

9      A    No.  It wasn't crime-free but as I said, I

10  can remember over a couple of dozen cases in almost

11  20 years.

12     Q    We have it on good authority that more

13  than one CHA tenant over the years has had a

14  criminal record, that it's actually not a rare thing

15  for a CHA tenant to have a criminal record; isn't

16  that true?

17          MR. HOUSTON:  Objection to form.

18     A    There are some tenants that -- I have to

19  answer this, correct?

20          MR. HOUSTON:  Uh-huh.

21     Q    Yes.

22     A    Background checks were done and if they

23  were violent offenders, they had to go through the

24  criteria, but to say that -- I'm not doing this very

25  well.  If people had criminal backgrounds, it was

HUNTER, et al. v. CORTLAND HOUSING AUTHORITY, et al.
Carole Preston  ---  May 8, 2024

53

C. Preston

1

2    possible to get public housing but it depended on

3    the crime, the severity, the -- how recent they

4    were.  There were a lot of variables.

5        Q    I know, but I guess I'm not really asking

6    about variables.  I'm asking you:  During your

7    20 years at CHA, did CHA accept tenants who had

8    criminal records; yes or no?

9        A    Yes.

10       Q    Thank you.  Did CHA -- during your tenure

11   at CHA, did CHA ever accept as tenants any

12   individuals who had committed violent crimes?

13       A    Ever?

14       Q    Yes.

15       A    I don't know.

16       Q    Well, okay.  What was the limit?  In fact,

17   did CHA have any criteria for excluding tenants?

18       A    For excluding tenants?

19       Q    Yes.  For excluding tenants with criminal

20   records.

21       A    Sex offenders were -- you know, I may not

22   be remembering this correctly.  If you were a

23   registered sex offender, that was an automatic

24   denial.

25       Q    No registered sex offenders, right?

HUNTER, et al. v. CORTLAND HOUSING AUTHORITY, et al.
Carole Preston  ---  May 8, 2024

57

C. Preston

1

2      A     Again, it depends on how long ago the

3     crimes were.  There were so many variables and I

4     have been out of it for so long.

5      Q     During your 20 years at CHA, did CHA ever

6     accept a convicted murderer as a tenant?

7      A     Not to my knowledge.

8      Q     During your 20 years at CHA, did CHA ever

9     accept somebody who had been convicted of any

10    homicide crime as a tenant?

11     A     Not to my knowledge.

12     Q     During your 20 years at CHA, did CHA

13    accept anyone who had been convicted of robbery?

14     A     Not to my knowledge.

15     Q     During your 20 years at CHA, did CHA ever

16    accept somebody as a tenant who had been convicted

17    of arson?

18     A     Not that I know of.

19     Q     During your time at CHA, did CHA ever

20    accept anyone as a tenant who had been convicted of

21    any kind of sexual assault?

22     A     Not to my knowledge.

23     Q     During your 20 years at CHA, did CHA ever

24    accept anyone who had been convicted of any drug

25    offense?

HUNTER, et al. v. CORTLAND HOUSING AUTHORITY, et al.
Carole Preston  ---  May 8, 2024

57

C. Preston

1

2      A    Again, it depends on how long ago the

3    crimes were.  There were so many variables and I

4    have been out of it for so long.

5      Q    During your 20 years at CHA, did CHA ever

6    accept a convicted murderer as a tenant?

7      A    Not to my knowledge.

8      Q    During your 20 years at CHA, did CHA ever

9    accept somebody who had been convicted of any

10   homicide crime as a tenant?

11     A    Not to my knowledge.

12     Q    During your 20 years at CHA, did CHA

13   accept anyone who had been convicted of robbery?

14     A    Not to my knowledge.

15     Q    During your 20 years at CHA, did CHA ever

16   accept somebody as a tenant who had been convicted

17   of arson?

18     A    Not that I know of.

19     Q    During your time at CHA, did CHA ever

20   accept anyone as a tenant who had been convicted of

21   any kind of sexual assault?

22     A    Not to my knowledge.

23     Q    During your 20 years at CHA, did CHA ever

24   accept anyone who had been convicted of any drug

25   offense?

HUNTER, et al. v. CORTLAND HOUSING AUTHORITY, et al.
Carole Preston  ---  May 8, 2024

58

C. Preston

1

2      A    Any drug offense?

3      Q    Yes.

4      A    Then I would say yes.

5      Q    Any drug felonies?

6      A    I don't even remember.

7      Q    Well, here's what I'm having trouble with,

8  during your 20 years at CHA, CHA did -- I repeat

9  did -- accept tenants who had criminal records,

10 correct?

11     A    Yes.

12     Q    But we just went through a whole laundry

13 list of crimes and you said that CHA never accepted

14 those people.  So what kind of crimes were accepted?

15     A    It could have been burglary, it could have

16 been carjacking, it could have been --

17          MR. HOUSTON:  Carjacking?

18     A    I'm throwing that out there.  Kids go for

19 a joyride in a car, that kind of thing.

20     Q    That's not carjacking, that's joyriding.

21     A    Okay.  Whatever.

22     Q    Carjacking is a violent crime.

23          Did you know that burglary is a

24 felony?

25     A    No, I didn't.

HUNTER, et al. v. CORTLAND HOUSING AUTHORITY, et al.
Carole Preston  ---  May 8, 2024

59

C. Preston

1

2      Q    Did CHA during your time there ever accept

3   any convicted burglars as tenants?

4      A    I don't know.  I don't remember.

5      Q    During your time at CHA, did CHA ever

6   accept any felons as tenants?

7      A    I don't remember.

8      Q    During your time at CHA, was it your

9   responsibility to review prospective tenants'

10  criminal records and make decisions about same?

11     A    Yes.

12     Q    Was it a daily responsibility, a weekly

13  responsibility or a monthly responsibility?

14     A    I would say more like weekly.

15     Q    Okay.  In your 20 years at CHA, how many

16  criminal records of prospective tenants do you think

17  you reviewed?

18     A    Hundreds.  Honestly, I don't know.

19     Q    Is it possible it was thousands; is that

20  possible?

21     A    I don't think it was thousands.  I would

22  say hundreds.

23     Q    I guess what I'm having trouble with is

24  the following:  You just testified that a

25  significant part of your job responsibilities was to

HUNTER, et al. v. CORTLAND HOUSING AUTHORITY, et al.
Carole Preston  ---  May 8, 2024

60

C. Preston

1

2    review the criminal records of prospective tenants,

3    right?

4        A    Yes.

5        Q    I'm not asking you to tell me, oh, can you

6    tell me about Mr. Jones in 2012 or Mr. Smith in

7    2008.  I'm asking you in general terms and you're

8    saying you don't remember what kind of crimes were

9    accepted, I'm just struggling with that.

10                Are you testifying today that,

11    despite the fact that this was a huge part of your

12    job responsibility, that you don't remember any

13    instances of felons being accepted as tenants?

14        A    I don't because if I denied them for

15    whatever reason -- and it didn't have to be just on

16    their criminal background, if I denied them, they

17    had the right to a fair hearing which would go to

18    upper management and they could then decide the

19    cases.

20        Q    I won't linger on this point because you

21    have answered it, but I want to be sure, yes or no,

22    yes or no, during your 20 years at CHA, did CHA

23    accept as a tenant a felon?

24        A    I don't know.  I honestly don't know.

25        Q    I will accept your answer.